UNITED STATES, Appellee

v

TOMMY J. KITCHENS, Private First Class,
U. S. Army, Appellant

12 USCMA 589, 31 CMR 175

No. 15,271

December 22, 1961

*Captain Vernon C. Maulson* argued the cause for Appellant, Accused. With him on the brief were *Lieutenant Colonel Ralph W. Wofford* and *First Lieutenant Ira M. Lechner.*

*First Lieutenant Carl F. Wrench* argued the cause for Appellee, United States. With him on the brief were *Lieutenant Colonel James G. McConaughy* and *Major Francis M. Cooper.*

QUINN, Chief Judge:

After the law officer denied a motion to dismiss the charges against him on the ground, among others, of illegal command influence, the accused entered a plea of guilty to larceny of an office safe; larceny of a truck; and housebreaking, in violation of Articles 121 and 130, respectively, Uniform Code of Military Justice, 10 USC §§ 921, 930. The convening authority approved the conviction and a board of review affirmed. We granted further review to consider whether command influence affected the trial proceedings.

It appears that the accused and some service companions went from bar to bar on the night of December 14, 1960, in the city of Columbia, South Carolina. In the course of their wanderings, they consumed a considerable quantity of intoxicants. They also became acquainted with a civilian named Billy Stiltner, who joined the group. Stiltner was about ten years older than most of the servicemen and had a criminal record dating back to 1951. About 2 o'clock in the morning, as the group left a bar, Stiltner proposed "robbing a filling station." At that time, at least two of the others were too intoxicated to be able to coordinate physically, and they had no definite recollection of the succeeding events. The entire group went to Stiltner's house to get a gun. They did not, however, obtain a weapon. Instead, they procured a crowbar. Eventually, five of the group, including the accused and Stiltner, broke into a furniture store. Stiltner suggested they take a large office safe. It was put on a truck found parked at the rear of the store. They then drove off in the truck.

For a time, they drove aimlessly around. On Stiltner's recommendation they proceeded to a secluded area near the railroad tracks and "dumped the safe off in a clump of bushes." Leaving the area, Stiltner, who was driving the truck, ran into a parked police patrol car. All the servicemen were immediately taken into custody, but Stiltner ran away. However, he was later apprehended.

On January 10, 1961, the accused and four of his companions were arraigned before the Court of General Sessions, Richland County, South Carolina, on charges of housebreaking and larceny of the safe and truck. All pleaded guilty. The accused and the other servicemen were sentenced to three years' confinement but the sentences were suspended and all were placed on probation for five years. It was stipulated at the court-martial that appropriate military authorities knew of accused's incarceration by the civilian authorities but did not request his release for trial by court-martial.

The accused's commanding officer, Captain C. M. McCullers, was "aware" of the civilian prosecution of the accused. "Immediately after [that] trial," he intended to recommend accused's administrative separation from the service under AR 635–206, which authorizes discharge of enlisted persons convicted of crime by civil authorities, rather than initiate a second prosecution by the military for the same offenses. However, he received a telephone call from Lieutenant Colonel Young, the staff judge advocate, who indicated he "had been to the front office and that the feeling was that the sentence [adjudged by the civilian court] was not adequate." Colonel Young also called Captain McCullers' attention to AR 22–12 which, in part, provides as follows:

"A person subject to the Uniform Code of Military Justice who has been tried in a civil court *normally* will not be tried by court-martial or punished under the Uniform Code of Military Justice, Article 15, for the same act or acts over which the civil court has exercised jurisdiction."[1]

---

[1] The regulation was recommended by The Judge Advocate General of the Army. He gave the following reasons for the recommendation:

After his conversation with the staff judge advocate, Captain McCullers read AR 22–12. He studied the accused's case in the light of the regulation and concluded that "the Article 32 officer was better qualified [than he] to come up with a final determination in the case." Accordingly, he signed the charge sheet as accuser, and forwarded it with a recommendation for trial by general court-martial. The charges were referred to Major R. Coats for investigation, as provided by Article 32 of the Uniform Code. He conducted an extensive examination, hearing testimony from both military and civilian police to the effect that all the servicemen accused had done a "foolish thing," which they might not have done but for their chance acquaintance with Stiltner, and other evidence indicating the accused were making restitution to the store owner for the damage suffered by him.

Major Coats formally recommended that the "ends of justice" had been met by the civil prosecution and that the accused "not be tried by court-martial for these offenses." He also recommended, as Captain McCullers had originally proposed, that the accused be administratively discharged under the provisions of AR 635–206. These recommendations were not concurred in by the staff judge advocate. Instead, he recommended the accused be tried by general court-martial because "it appears that authorized administrative action is inadequate and that punitive action in the form of trial by general court-martial is appropriate." The convening authority accepted the latter recommendations and referred the charges to trial by general court-martial.

About the time Captain McCullers received the telephone call from the staff judge advocate, a letter dated January 20, 1961, was circulated, with certain exceptions not important here, to all officers in grades from Captain to Colonel stationed at Fort Jackson, the place at which the general court-martial which tried the accused was convened. The letter was headed "HEADQUARTERS FORT JACKSON, Office of the Staff Judge Advocate"; and purported to be "a personal request for information which may be used for instructional purposes and for guidance of those involved in the administration of military justice." The letter was signed "Robert N. DuRant, Lt. Col. JAGC, Asst Staff Judge Advocate." At the time, Colonel DuRant was Chief of Military Justice in the office of the staff judge advocate.

The letter set out the charges and the sentences imposed in four general court-martial cases tried at Fort Jackson since September 1, 1960, and the charges and the sentence adjudged in six cases in the three-month period before September 1, 1960. Although not indicated in the letter, the cases were selected from among those tried in both periods. Also, while the offenses in both sets of examples were not the same, the letter represented that the cases showed "a considerable difference in the sentences adjudged since September 1 as compared with those adjudged prior to that date." Special attention was called to the fact that a punitive discharge (bad-conduct discharge) was imposed in only one of the cases tried after the critical date. But, no mention was made of the fact, as stipulated at trial, that "in three of the cases [listed] the Article 32 officer recommended trial by special court-martial."[2] Comment was invited

---

"Both AR 22–12, 24 April 1958 and Paragraph 28e, AR 624–200, 19 May 1958 originated in my office. AR 22–12 adopts a practice long in use in the Navy and Air Force of discouraging trial by court-martial following conviction by civil court except in very rare cases. Regardless of legal theories, such double trials are considered generally by the public as unfair 'double jeopardy.'

They have been the subject of many complaints to the Department of the Army." [JAGJ 1958/5936, September 16, 1958.]

[2] The record of trial does not specifically indicate in which group these cases belong, but it is reasonably inferable from the surrounding circumstances that they are within the post-September group.

on "the reason for this apparent change in the approach to general court-martial cases within this command." The addressees were assured their replies would "remain anonymous.".

The court that tried the accused was convened on February 24. After some proceedings it was adjourned to March 2. On reconvening the entire panel was subjected to *voir dire* examination about Colonel DuRant's letter. Each of the six members of the court acknowledged he had received a copy of the letter. The court was "handed" a second letter by Colonel DuRant, dated February 28, 1961. This letter, like the January 20 letter, carried the letterhead of the "Office of the Staff Judge Advocate" and was signed by Colonel DuRant "Assistant Staff Judge Advocate." While it was stipulated that this letter had been "dispatched . . . to the same officers who received the first letter," there is no direct indication it was actually received by the court-martial members before the copy was "handed" to them at trial.

In his second letter, Colonel DuRant said he had received "many replies" and the "helpful comments" were appreciated. He also said that although no addressee had indicated any "misunderstanding of the purpose and intent" of his first letter, "the defense counsel, in every case tried by general court-martial, has contended that my letter constituted unlawful command influence." To "eliminate any confusion . . . or false impression," he reiterated he had made only *"a personal request for information"* which had not been directed or approved by the commanding general or the staff judge advocate.

Three of the six members of the court admitted they considered the letter as expressing an opinion on the "adequacy of sentences adjudged" by general courts-martial in the current period. The remaining three members said they did not "take . . . [the letter] in that light." But they did not disclose in what "light" they did regard it. Each member indicated he would not be influenced by the letter in adjudging sentence, and he had not formed an opinion as to what constituted an appropriate sentence in a general court-martial case. Finally, it appears that defense counsel asked to see the replies to the January letter but the request was denied by Colonel DuRant. There is no indication whether any member of the court replied to the letter.[3]

The Government contends that Colonel DuRant's original letter is merely a personal request for information which contains no indication of command interest. Consequently, its argument continues, the letter is in-

---

[3] We are informed that after the trial of this case, but before the trial of Pvt. Johnny H. Barrett, CM 405993 (one of the accused's companions in the commission of the offenses charged), 12 USCMA 598, 31 CMR 184, Colonel DuRant called defense counsel to his office. He reportedly told counsel that if he had not yet decided to "live in peace in the office," he would be "dealt with accordingly." Counsel understood Colonel DuRant's comments as a reference to his contention that the letter of January 20 represented improper command influence. He told the colonel that if he was suggesting he give up what he considered a legitimate defense, he could not do so. Colonel DuRant ordered him "most emphatically never to say that to him again." Not long thereafter defense counsel received an efficiency rating that was substantially lower than two ratings received previously from Colonel DuRant. The inference suggested to us is that the reduction in rating is a form of pernicious command influence which we should strike down. See United States v Dean, 5 USCMA 44, 17 CMR 44. The circumstances may indeed call for vigorous investigation, and if the allegation is established, may justify punitive proceedings. See United States v Long, 2 USCMA 45, 6 CMR 45. However, the asserted effort was fortunately not successful; consequently, we must decide the issues before us in this case without regard to the implication of Colonel DuRant's remarks to defense counsel and the reduction in defense counsel's efficiency rating. Cf. In re Taylor, 12 USCMA 427, 31 CMR 13.

capable of influencing the court members. The letter does indeed purport to be a "personal request" for information, but it also expressly states that the replies will be used for "instructional purposes and for guidance of those involved in the administration of military justice." Official, not personal use, is thus its obvious purpose. The officiality of purpose is emphasized by the description of the signator as assistant staff judge advocate, and the letterhead showing the correspondence as emanating from the office of the staff judge advocate. In our opinion, anyone reading the letter would conclude it was not simply individual interest that prompted it, but official concern by those responsible for the administration of military justice with what was conceived to be a "change in approach" to general courts-martial cases within the command. Perhaps Colonel DuRant honestly believed the letter would not convey an impression of official interest in the sentence situation, but that idea is very definitely left with the reader. It is from that standpoint, therefore, that the effect of the letter must be considered. See United States v Gordon, 1 USCMA 255, 2 CMR 161.

Looked upon as an official inquiry, there is a disturbing implication in the letter. It properly suggests that offenses involving moral turpitude are "serious" but it conveys the idea that there is great official disquietude because some accused convicted of such offenses by general court-martial have not had a punitive discharge imposed upon them. Special attention is called to this grave deficiency in three of the four cases in the post-September period. Instead of considering the myriad of possible mitigating circumstances relating to each individual accused as the reason for the sentences in these cases, the letter attributes the failure to impose severe sentences in a "serious" case, to inexperience or "lack of orientation" of the court members, or to some undefined deficiency in the instructions of the law officer. Cf. United States v Mamaluy, 10 USCMA 102, 27 CMR 176.

Without belaboring the obvious, the letter is a manifest criticism of the supposed inadequacy of the sentences imposed in recent cases tried by general courts-martial. More specifically, the criticism is directed at the failure of general courts-martial to adjudge a punitive discharge. Yet, it would appear from the stipulation regarding the recommendations by the Article 32 investigation officer in three of the four cases, that there were strong circumstances in each, which were accorded appropriate weight by the investigating officer and the court-martial, but which were undervalued or disregarded by the staff judge advocate and the convening authority. See United States v Schuller, 5 USCMA 101, 17 CMR 101; United States v Greenwalt, 6 USCMA 569, 20 CMR 285. In addition, the matters set out in the letter itself clearly indicate no sound basis upon which to base the stated conclusion that there was a "change in approach" by court members in the post-September period.

On the *voir dire* all members of the court-martial said they would not be influenced by the letter and would impose an "appropriate sentence." We have no doubt each member sincerely thought he was free from undue influence. Yet, a punitive discharge was in fact imposed upon each accused. Perhaps the sentence is really appropriate, but we cannot close our eyes to the fact that the punishment meted out meets exactly the criticism of general courts-martial levelled in Colonel DuRant's letter.

It will be recalled that the accused's own commanding officer, Captain McCullers, intended to separate them administratively, but eventually left the decision to the Article 32 investigating officer, because he believed the latter was better qualified to decide. That officer recommended that the charges be disposed of administratively. We know, too, that in three of the four courts-martial about which the letter complained, the sentence imposed by the court came within the range recommended by the investigating officer. Might not the same be true here, if the DuRant letter had not

come to the attention of the court? We cannot answer that question with any degree of assurance; and since we cannot, we must accord the accused the benefit of the doubt, and hold that he was prejudiced by the letter despite the *voir dire* representations of the court members. See United States v Zagar, 5 USCMA 410, 414, 18 CMR 34. What we said in the *Zagar* case is worth repeating here:

"Government appellate counsel have insisted that, in judging the validity of the court's action, we are bound by the insistence of each member of the court-martial that he would not be influenced in any degree by the statements of Colonel Chuck, the Staff Judge Advocate. We must reject this view at once, for—although we entertain no doubt of the complete sincerity of the officers concerned—we recognize the present applicability of the comment that jurors are human and not always conscious to what extent they are in fact biased or prejudiced and their inward sentiments can not always be ascertained. See Stone v United States, 113 F2d 70 (CA 6th Cir). Accord: United States v Adamiak, 4 USCMA 412, 15 CMR 412;

United States v Rakes, 74 F Supp 645 (ED Va)."

In reaching our conclusion, we have not overlooked the second letter written by Colonel DuRant ■ which was handed to the court-martial. Government counsel contend this letter "re-emphasiz[ed] that the first [letter] was a *personal* request" for information. In our opinion, it aggravated, rather than alleviated, the import of the original letter. It attempted to undermine, before trial, any defense effort to challenge the import and influence of the letter.

The decision of the board of review as to the sentence is set aside. The record of trial is returned to The Judge Advocate General of the Army for submission to a board of review. In its discretion, the board of review may reassess the sentence by eliminating the punitive discharge imposed by the court-martial or it may direct a rehearing thereon. See United States v Fowle, 7 USCMA 349, 22 CMR 139. Cf. United States v Kelley, 5 USCMA 259, 17 CMR 259.

Judges FERGUSON and KILDAY concur.