UNITED STATES, Appellee

v

BILL G. WOOD, Master Sergeant, U. S. Air Force, Appellant

13 USCMA 217, 32 CMR 217

218

No. 15,615

August 3, 1962

*Lieutenant Colonel Wallace N. Clark* argued the cause for Appellant, Accused. With him on the brief was *Colonel Joseph E. Krysakowski.*

*Lieutenant Colonel Simpson M. Woolf* argued the cause for Appellee, United States. With him on the brief was *Colonel Merlin W. Baker.*

## Opinion of the Court

KILDAY, Judge:

I

Accused, a master sergeant who had served as first sergeant of the hospital, was tried by a general court-martial convened at England Air Force Base, Louisiana. He was convicted of a five-month absence without leave, violative of Article 86, Uniform Code of Military Justice, 10 USC § 886; and numerous specifications of larceny by check, contrary to Article 121 of the Uniform Code, 10 USC § 921, committed during the period of unauthorized absence.

The court-martial sentenced accused to dishonorable discharge, confinement at hard labor for six months, forfeiture of $43.00 per month for that same period, and reduction to the lowest enlisted grade. The findings and sentence were, in turn, approved by the convening authority and affirmed by a board of review.

Thereafter, accused sought review by this Court, and we granted his petition in order to consider several issues developed during *voir dire* examination and relating largely to alleged improper command control. We shall treat with

**219**

them *seriatim,* and such facts as are germane to resolution of each issue may conveniently be set forth in the course of our discussion.

It may be noted that we are not faced with any difficult questions of law here, for on numerous previous occasions we have considered the issue of command influence. See United States v Davis, 12 USCMA 576, 31 CMR 162, and authorities therein collated. The problem presently before us involves merely application of settled rules to the facts of the instant case.

## II

The first granted assignment poses the question whether the court-martial erred in failing to sustain a challenge for cause leveled against Major Baglio, one of the members. The defense predicated said challenge on the ground that Baglio had received a letter dealing with military justice which would influence him with regard to sentence, and the member had indicated that in the event of·conviction he would consider the fact accused was a first sergeant adversely on sentence.

Regarding the second asserted basis for disqualification, suffice it to comment that the defense distorts Baglio's position. True enough, he indicated he was "afraid" the fact serious crimes were committed by one who thereby breached a position of responsibility as a senior noncommissioned officer might be a matter in aggravation. But, considering the whole of his answers on this point it is apparent that, with regard to sentence, he would take into consideration all pertinent matters, including an accused's rank, length of service, and the nature thereof; the responsibility involved in the position he held; and, generally, all the circumstances adduced. Further, he indicated he was unable to state, in the absence of other relevant factors, the impact of the single item of rank. Significantly, when defense counsel made pointed inquiry, Baglio indicated that matter might augur for or militate against accused, depending on all the evidence. Thus it cannot be said Baglio was, for

this reason, disqualified as a matter of law. See United States v Deain, 5 USCMA 44, 49, 17 CMR 44, where Chief Judge Quinn wrote that, although an accused clearly is entitled to have his guilt or innocence determined by a jury composed of individuals with a fair and open mind:

". . . Transient or 'light impressions' of an accused's guilt or innocence will not disqualify a juror, if it is plainly demonstrated that such impressions will easily yield to the evidence presented in open court and to the law propounded by the trial judge. Reynolds v United States, 98 US 145, 25 L ed 244. So, too, a general or abstract bias against particular classes of offenses or persons is not necessarily disqualifying. United States v Noelke, 1 Fed 426 (CC SD NY 1880); Temple v Moses, 175 Va 320, 8 SE 2d 262. There can, of course, be no degrees of bias, but, essentially, the question of whether bias exists is one of fact. If the evidence touching the issue is in conflict, the balance must be struck by the person or persons having authority to rule on the challenge. There must be a clear abuse of discretion in resolving the conflict before an appellate tribunal, which lacks the power to reweigh the facts, will reverse a decision. State v Dickson, 200 Iowa 17, 202 NW 225; Temple v Moses, supra; People v Martinez, 31 Cal App 413, 160 Pac 868."

The other facet of this assignment concerns a letter regarding the duties and responsibilities of court-martial members dated over twenty-one months prior to the time of trial. It was not beamed to court members alone, but was distributed generally. It was authored by the legal adviser on the staff of a command inferior to that which ·convened the instant court-martial, and went out over that officer's signature. Major Baglio, however, was a member of the lesser command, and had received and read the letter, which without question contains a number of mistaken notions as to matters bearing on sentence. Indeed, before this Court the Government concedes several such

220

items are legally erroneous and others, at the least, questionable. And in that connection appellate defense counsel point out that the offending nature of the document must have been apparent even to the author thereof, for some three weeks prior to trial a revised edition, from which the erroneous portions had been eliminated, was distributed.

Major Baglio also received a copy of the new missive. Upon questioning, he averred that the accompanying instructions directed it was to supplant the old one, but there was no indication of what had been omitted and he could not tell without making a comparison. Further, the Major stated it had been some eighteen months since he received the first letter, and that he had not referred to the same for over a year. Prior to having seen, in court, the old letter here assailed by the defense as a deleterious communication injecting improper command influence, Baglio had no independent recollection of its contents. It is against that backdrop that we take into account a final consideration, for Major Baglio affirmed that he would determine such matters as were his concern as a court member pursuant to the law officer's instructions; that he would try the issues by those standards uninfluenced by any out-of-court events. And the charge by the law officer regarding sentence was wholly correct and twice emphasized the independent and unfettered responsibility of the court-martial to impose appropriate punishment based on the evidence and circumstances and without regard to other considerations.

Standing alone, the fact that this member recived, at a time so long prior to trial and from the legal ▮▮▮▮▮▮▮ adviser to a commander subordinate to the convening authority herein, a communication setting forth erroneous statements of law, does not require his disqualification. Particularly is that so where Major Baglio had not referred to the letter for so long, retained no knowledge of its contents, and indicated his willingness to follow the law officer's instructions without regard to possible outside influences. Thus, in the posture of the present record, it cannot be said as a matter of law that the directive constituted improper command leverage which rendered the Major disqualified from serving impartially. Cf. United States v Kitchens, 12 USCMA 589, 31 CMR 175.

We turn our attention, therefore, to a single area where Baglio indicated, generally, his agreement ▮▮▮▮▮▮▮ with the letter's admonition that court members should not interfere in the field of rehabilitation, which was the province of the commander. Again, when this member's answers are considered in context, we cannot hold, as a matter of law, it was error to retain him on the court-martial. Thus, he indicated his agreement that a court-martial, itself, could not in fact rehabilitate anyone, and this colloquy ensued:

"DC. Of course we're not expecting the court to actually rehabilitate but whether or not the court should provide for it properly.

"MAJ BAGLIO. That's right, and whether or not a person, based on what was presented, whether or not he's a person that can be rehabilitated and be of use to the service. All these things are taken into consideration."

It would appear that it could fairly be concluded Baglio, while he thought a court-martial was not in a position itself to effect rehabilitation, was quite willing to take into consideration an accused's capacity for rehabilitation.

For the above reasons, we decline to hold the court-martial abused its discretion in refusing to sustain the challenge for cause against Major Baglio.

### III

It is also contended by appellate defense counsel that the court-martial erred in rejecting the challenge for cause against another member, Major Ashley, on the basis of his answers to *voir dire* examination.

So far as the letters to which we adverted in part II, above, are ▮▮▮▮▮▮▮ concerned, Ashley, like Baglio, was a member of the subordinate command that circulated

**221**

them. But in answer to whether he had ever seen the old letter, Major Ashley stated he could not recall. Certainly it had made no impression on him. The revised edition thereof, he testifield, had been sent to him, but he had merely glanced at the heading. He had not had time to read it and it still reposed on his desk at time of trial. It is manifest these facts do not reflect adversely on whether Ashley should sit on the court-martial. Moreover, when queried by defense counsel regarding one matter covered in the old letter, Major Ashley expressed his disagreement with the concept set forth therein that reference to trial by general court-martial indicated the propriety of sentences more severe than imposable by lesser courts. Cf. United States v Boese, 13 USCMA 131, 32 CMR 131.

Similarly, we can find no fault with Ashley's answer regarding accused's position as first sergeant ▉▉▉▉▉▉ ▉ and his lengthy service. He, like Major Baglio, reminded the defense counsel he was getting into "generalities," whereas there was before them a specific case, one of which would differ from another. Hence we are unable to find the court-martial was required to sustain a challenge against him on the basis of his belief that, as a general matter, "The amount of responsibility of the individual of course is determined by his position, and a violation of that responsibility of course would weigh greater than violation of responsibility by an individual of a lesser stature." As an abstract proposition, Ashley's attitude is not wholly without foundation. But, in any event, it is apparent he did not consider this an inflexible rule, and that he would evaluate accused's case, as any other, on the whole of the attendant facts.

The final aspect of the challenge against Ashley concerns certain publications emanating from various levels of the Air Force pertaining to dishonored checks and financial responsibility. It is not necessary to recount their specific provisions; generally, they counsel adherence to high standards, elimination of any problems in this area, and set forth certain administrative control measures. While there is no showing Major Ashley or other court members had received all of these writings, it is clear he was aware of at least some and they were distributed generally. They were, as others of similar import had been for a number of years, circulated to all officers. Like the letter discussed earlier in part II, they were not directed to court-martial members alone and, indeed, some had not been seen by certain members of this court until injected into this proceeding by the defense.

Their possible impact on Major Ashley was the subject of extensive inquiry by the defense, which contends ▉▉▉▉▉▉ ▉ his answers fairly shriek of the biased attitude of a "company man." Exemplary of this, we are told, are even Ashley's answers to trial counsel when the latter attempted to rehabilitate him. We do not agree. The gist of the member's position as brought out by the prosecution was simply general agreement, "as a matter of principle" that the Air Force was opposed to the writing of bad checks, and that one convicted criminally for such conduct should be punished in some way. We see nothing untoward in that attitude. Cf. Robinson v United States, 128 F 2d 322 (CA DC Cir) (1942).

Moreover, we deem the instant situation distinguishable from United States v Olson, 11 USCMA 286, 29 CMR 102. There the president of the court, in his regular capacity as deputy chief of staff, had responsibility for a written directive relative to the large number of offenders floating dishonored checks. It was also his duty to monitor the command's bad check program. Further, on the day prior to trial, the president delivered a pointed lecture, attended by many court members, emphasizing the high incidence of check offenses in the command and the necessity to take positive action to eliminate such misconduct. That combination of factors was held to influence, improperly, the court-martial, and to tempt them to make an example of the accused. Here, however, we are not confronted with the aggravated situation found in *Olson,* and even in that in-

stance we recognized a commander's responsibility for appropriate preventive measures consistent with a balance between justice and discipline. United States v Littrice, 3 USCMA 487, 13 CMR 43; United States v Isbell, 3 USCMA 782, 14 CMR 200; United States v Carter, 9 USCMA 108, 25 CMR 370.

We conclude the publications here involved must properly be included in the latter category. They seem to be of the permissible prophylactic variety. And we are reinforced in that conclusion, not only by the court-martial members' universal affirmation that they would try the case on the evidence and the law officer's instructions alone, but by their categorical statements that none were aware of any desired result in accused's case by superior authority, nor did they feel the convening authority's reference for trial indicated a desire for a severe sentence.

Left for consideration, then, in regard to this issue, is only the defense complaint that Major Ashley admitted he would take the financial directives into consideration. The short answer would seem to be that Ashley, untrained in the law and seeing the directives apparently put into evidence at this preliminary proceeding, assumed he should pay heed to them. Thus he answered he would consider on sentence all matters utilized in resolving guilt or innocence, including the directives if they be used on the merits. And we note that before proceeding to trial on the merits, the law officer withdrew from the court members all exhibits utilized in conjunction with *voir dire,* and expressly admonished them to disregard anything contained therein.

Accordingly, we find no abuse by the court-martial in rejecting the challenge against Ashley, and this assignment, too, must be resolved adversely to accused.

## IV

The defense also asserts the law officer erred in sustaining an objection to a question posed by defense counsel during *voir dire* examination. It is

helpful to consider the context in which this incident occurred. Major Ashley had just indicated, with regard to the circulars on financial responsibility, that he would consider on sentence all circumstances, including those bearing on findings. Thereupon defense counsel made the same inquiry of Major Baglio, and received a substantially similar answer. It was at that juncture Baglio was asked:

"In other words, you feel that even though you are a member of the court, you are at the same time an officer of the Air Force and it is necessary for you to enforce so-to-speak such directives?"

Trial counsel immediately interposed an objection which the law officer upheld, and the defense finds fault with the latter's action.

We have already considered the nature of the communications involved, concluding they fall within the permissible class and do not inject improper command influence into the proceedings. Additionally, as we have noted, Baglio's answers were substantially identical to Ashley's. Moreover, the argumentative nature of the question is apparent.

We hold the law officer did not err in sustaining the objection.

## V

The next assignment deals with a motion for mistrial made by the defense after action on challenges was complete. It was based "essentially on the [same] command influence" asserted during *voir dire.*

The law officer denied said motion, and from our discussion hereinbefore of the other granted assignments, it is clear we are unable to find any abuse of discretion on his part. None of the five officers who sat on accused's court-martial were shown to have been affected by any of the "noxious" communications assailed by the defense. This is true even of the admittedly erroneous portions of the initial letter considered in part II, earlier. Indeed, one member had not received the same

and, except for Major Baglio, none of the other members could recall receiving that twenty-one-month-old missive.

The court-martial was not shown to be unfit to sit dispassionately but, to the contrary, the record supports the law officer's determination they could and would decide the matters before them wholly without regard to any outside considerations. Hence this asserted ground for reversal must be rejected.

VI

The foregoing discussion also disposes largely of the final issue upon which we granted review, namely, whether paragraph 16 of the twenty-one-month-old letter mentioned in part II, above, constitutes command control affecting sentence.

The Government candidly concedes the impropriety of certain concepts spelled out therein. But, ▮ as is evident from what we have stated earlier, the mere existence 'of an epistle setting forth erroneous principles is not itself a decisive factor. We entertain little doubt concerning the lack of wisdom in disseminating views which could color a court-martial member's judgment. However, we deal in this instance with a specific case, and here we find no basis to conclude the letter, composed by the staff judge advocate of a command inferior to that convening this court-martial, and distributed so long prior to trial, had any impact whereby accused was deprived of his fundamental right to have his case decided by impartial court members.

VII

For the foregoing reasons, the decision of the board of review is affirmed.

Chief Judge QUINN concurs.

FERGUSON, Judge (dissenting):

I dissent.

When we recently decided United States v Kitchens, 12 USCMA 589, 31 CMR 175; United States v Smith, 12 USCMA 594, 31 CMR 180; and United States v Barrett, 12 USCMA 598, 31 CMR 184, I concurred, believing that the disposition of these cases established a return by my brothers to our former, clear-cut recognition of the barrier which Congress sought to erect between the military judicial process and the interference of command. The decision here, however, establishes that our reversals in those cases were mere aberrations and that my brothers are, as they did in United States v Danzine, 12 USCMA 350, 30 CMR 350, and United States v Davis, 12 USCMA 576, 31 CMR 162, removing the last vestige of an accused's protection from the arbitrary control of court-martial sentences. In short, our affirmance here resurrects the discredited view that a court-martial is but an arm of the commander, and he is entitled to dictate the penalty it will adjudge.

I cannot agree, and in the hope of making my position with regard to command control clear and unequivocal, I set forth the reasons which lead me to conclude that either reversal should be had here or that Congress should immediately amend Uniform Code of Military Justice, Article 37, 10 USC § 837, to make it apparent to the most casual reader that it was thereby intended to clothe military tribunals, possessing the widest range of punitive powers, with full judicial character. Necessarily, therefore, I must refer to the factual situation depicted in this record, for I view it in a different light from the majority.

Accused was found guilty of absence without leave, in violation of Code, supra, Article 86, 10 USC § 886, and eleven specifications of larceny by check, in violation of Code, supra, Article 121, 10 USC § 921. He was sentenced to dishonorable discharge, forfeiture of $43.00 per month for six months, confinement at hard labor for six months, and to be reduced to the grade of basic airman. Intermediate appellate authorities affirmed, and we granted accused's petition for review on four issues specified therein, as follows:

"A. THE COURT MARTIAL ERRED IN FAILING TO SUSTAIN THE CHALLENGE FOR CAUSE OF MAJOR JOSEPH P. BAGLIO (R-8 and 27–31).

"B. THE COURT MARTIAL ERRED IN FAILING TO SUSTAIN THE CHALLENGE FOR CAUSE OF MAJOR S. ASHLEY. (R-18 and 27)

"C. THE LAW OFFICER ERRED IN SUSTAINING THE OBJECTION BY THE TRIAL COUNSEL DURING *voir dire* EXAMINATION BY THE DEFENSE COUNSEL TO THE QUESTION, 'IN OTHER WORDS, YOU FEEL THAT EVEN THOUGH YOU ARE A MEMBER OF THE COURT, YOU ARE AT THE SAME TIME AN OFFICER OF THE AIR FORCE AND IT IS NECESSARY FOR YOU TO ENFORCE SO-TO-SPEAK SUCH DIRECTIVES?' (R 20)

"D. IN VIEW OF THE COMMAND INFLUENCE EXERCISED IN THE CASE, THE LAW OFFICER'S DENIAL OF THE MOTION FOR MISTRIAL WAS PREJUDICIAL ERROR (R-31–32)."

In addition to the foregoing issues, the Court, on its own motion, specified that the following question be briefed and argued:

"Whether paragraph 16 of Appellate Exhibit A constitutes command control affecting the imposition of sentence."

The charges against accused were referred to trial on May 19, 1961. The court-martial convened on July 13, 1961, at England Air Force Base, Louisiana.

At the outset of the proceedings, one member of the court made known his prior knowledge of the events leading to the trial and, upon challenge, was duly excused. Following exercise of a peremptory challenge by the Government, defense counsel embarked upon a *voir dire* examination of the remaining court members. After asking several questions regarding their attitude in general, he produced Defense Exhibit A, a letter, dated October 1, 1959, and entitled "Duties and Responsibilities of Members of Courts-Martial." Directed to all officers of the command to which Majors Baglio and Ashley, members of court, belonged, it provided:

"16. Only serious cases are referred to a general courts-martial, and, conversely, serious cases, except under unusual circumstances, are not referred to inferior courts-martial. In determining what is a serious offense, we are guided not only by the charge itself, but by the Table of Maximum Punishments contained in the Manual. No case is sent to a general court when the maximum sentence for the offense charged may be imposed by a Special Court-Martial, nor to a special court-martial when the maximum sentence may be imposed by a summary court-martial. When a case is referred to a court for trial, you may be assured that a thorough study of the case has been made and that, if a conviction results, a sentence of the type not authorized for a lesser court is appropriate. You should remember that each case is referred to the lowest type of court which has the power to adjudge an appropriate and adequate punishment, after due consideration, prior to referral to trial, of the character, efficiency and length of service of the accused, the policies of the command and higher headquarters, the type of offense, and whether the accused should be separated from the service. Thus, if conviction results, a sentence of the type not authorized by a lower court is appropriate. However, there are exceptions to the foregoing. Sometimes the evidence for the defense is not available to the convening authority prior to trial. The evidence may develop in such a manner as to require a finding of Not Guilty; or, it may prove the accused guilty of a lesser included offense to that charged. In the latter case, the court should return a finding as to the lesser offense and adjudge a sentence appropriate thereto. In fixing a sentence, the court should bear in mind that there are three primary reasons for punishment. First, the old rule of retribution that has come down to us since biblical times that we must be punished for our sins, either here or in the hereafter, or both; second, in the case of serious crimes, it may be necessary to· incarcerate the accused in order to protect the public from him; and third, the deterrent effect of a sentence upon others who

might be similarly tempted. In the event the offense is aggravated or there is evidence of conviction of other crimes, the court may reasonably impose the maximum sentence. On the other hand, if there are extenuating circumstances, the court should consider them and adjudge an appropriate sentence, never, however, reaching the ridiculous. The imposition of a ridiculously light sentence, following conviction, destroys completely the deterrent factor of a sentence, and greatly compromises the seriousness of the offense and the system of military justice.

"17. The court must use a great deal of common sense in arriving at an appropriate punishment. For instance, conviction of an offense for which a long period of confinement is appropriate should result in a sentence which includes a punitive discharge. If the offense is such as to warrant long confinement, then it certainly warrants a separation from the service. A court should not adjudge a long term of confinement coupled with no, or very small, forfeiture. A man sitting in the guardhouse drawing his full pay and allowance is not conducive to good morale, in the minds of airmen who are trying to do their jobs and keep out of trouble. A court should never adjudge a punitive discharge with no confinement or forfeiture. An accused convicted of an offense so serious as to warrant a punitive discharge should not be free to wander around the base, drawing his full pay, while the court-martial proceedings are being reviewed and his discharge is being processed. It will often result in his committing further offenses. A careful reading of the forms of sentences will aid the court in arriving at a balanced, appropriate and adequate sentence.

"18. A court should not, through a misguided sense of sympathy for an accused or his family, enter the field of rehabilitation. Since the beginning of recorded history, people have been seeking the means of punishing an individual for wrongdoing without also punishing the wife, children and parents. The solution to this problem has not been found. Rehabilitation lies with the commander, and should not be determined in the courtroom. As a court member, do not deprive the commander of his rights in this regard, or the accused of his opportunity to participate in a rehabilitation program and to gain the training and other benefits resulting therefrom. Rehabilitation is based on prolonged study and observation. Many facts are available to a commander in this study that are not available to the court. It is a continuing study, and the attitude of the prisoner during confinement may well be an important factor. It is general policy in the Air Force to return to duty as soon as possible a prisoner who appears to have rehabilitated himself. This policy is predicated not only on the desire to give each man an opportunity to turn over a new leaf and get back on the right track, but as well on a viewpoint of economy for the Air Force.

"19. Machinery exists for the suspension of sentences in worthy cases, and it is a further policy of the Air Force to suspend punitive discharges except when rehabilitation appears useless. Such discharges are typically suspended in the case of first offenders, except on conviction of very serious crimes, such as crimes of violence, like murder, armed robbery, and other crimes involving moral turpitude to a marked degree. A man who behaves during the period of suspension may be assured that at the expiration of the period of suspension, the discharge will be remitted and he will return to full duty status.

"20. I want to repeat that rehabilitation is not a part of your courtroom duties. You should adjudge a sentence appropriate to the offense committed, taking into consideration all the surrounding circumstances, but leaving out of that consideration your guess as to the probable future conduct of the accused and his future value to the service. You have a per-

fect right to recommend to the convening authority, individually or collectively, that clemency be exercised. Such recommendations are not a part of the sentence however, but should be forwarded to the convening authority following the conclusion of the trial. The trial counsel and defense counsel will assist you in preparing a recommendation for clemency."

The directive was signed by Major (then Captain) James W. Woodcock, Staff Judge Advocate to the unit which issued it. Major Ashley stated that he could not "frankly . . . say yes or no" concerning whether he had read the letter "because I've read so many blurbs of this type that it is difficult to correlate this with any specific part." However, "one appeared in my in-basket approximately three days ago and I believe it's still sitting there, I haven't had time to look at it." Another member, Lieutenant Colonel DeWitt, had "previously read this material, similar material I'll say." Major Baglio had "seen this and . . . the new one." As a rule, according to Baglio, "the guidelines are presented to the members of the court in this fashion."

Major Baglio joined Lieutenant Colonel DeWitt in "generally" accepting "the theories expressed" in the letter. Whether an accused should be "rehabilitated" and "be of [continued] use to the service" are "reserved for the convening authority."

Approximately three weeks prior to the trial, Lieutenant Colonel DeWitt attended a lecture on military justice conducted by Major Woodcock and the defense counsel. Major Woodcock "certainly covered several points in this letter in detail." Colonel DeWitt "took his lecture seriously." No other member of the court attended the instruction.

In addition, defense counsel produced three other exhibits which dealt with the subject of bad checks. Defense Exhibit B, Tactical Air Command Regulation No. 35-5, dated January 16, 1961, was issued over the command line of General F. F. Everest, United States Air Force, Commander, Tactical Air Command. It stated that the "practice of issuing worthless checks will not be tolerated in this command, and prompt action will be taken under appropriate law or regulation to eliminate such practices." It provided for establishment of a control roster and indicated that chronic offenders "will be subject to non-punitive/punitive action and/or elimination from service."

Defense Exhibit C was a letter issued by Colonel Albert W. Schinz, United States Air Force, Commander, 401st Tactical Fighter Wing, to which many of the court members belonged. It pointed out that it had "long been a tradition of the military service that a man incapable of managing his own personal finances will be properly disciplined and, if necessary, removed from the service." It characterized "this tradition" as "sound and necessary," and went on to state that intentional writing of bad checks and failure to honor just debts was "cause for being placed on the control roster."

Defense Exhibits D and E were later letters from Headquarters Tactical Air Command pointing out the high incidence of bad check offenses involving noncommissioned officers. Exhibit E bore an endorsement, dated July 11, 1961, from the commanding officer of the unit to which Majors Ashley and Baglio were attached. The endorsement emphasized that "approximately 70% of our dishonored checks were written by NCOs." It went on to state that "commanders do not and should not tolerate financial incompetence among NCOs." Personnel who did not live up to expected standards were to be "dealt with as outlined in AFR 39-30, AFR 39-17 or the Uniform Code of Military Justice."

On further *voir dire*, Major Ashley stated that he would take the directives "into account" with respect to the findings and sentence. Major Baglio stated "these directives and policies . . . will be weighed in with everything else in adjudging a sentence if the man is found guilty." Thereafter, the law officer refused to permit defense counsel to inquire of Major Baglio whether he felt "that even though you are a mem-

ber of the court, you are at the same time an officer of the Air Force and it is necessary for you to enforce so-to-speak such directives?"

Upon trial counsel's interrogation of Major Ashley, that officer reiterated his belief that the command directives regarding bad checks bore on his "determination in the particular case" before the court. It would also be "taken into consideration . . . as another factor in arriving at a sentence, together with all other evidence in the case."

Finally, the law officer asked if each member could "well and truly try the issues between the accused and the government according to . . . standards" contained in his instructions on "your duties as court members." Each member responded that he would do so. A challenge against Major Ashley was not sustained. A challenge was then leveled against Major Baglio and similarly overruled. Prior to its submission to the court, a revised copy of the 1959 letter was identified by Baglio as superseding the older lecture and he declared that he had "just recently read it." However, he was not aware that the new letter changed any of the contents of the earlier directive.

The new letter, dated June 21, 1961, and also signed by Major Woodcock, includes the following statements in lieu of the portion of the 1959 letter quoted above:

"16. You should remember that each case is referred to the lowest type of court which has the power to adjudge an appropriate and adequate punishment, after due consideration, prior to referral to trial, of the character, efficiency and length of service of the accused, the policies of the command and higher headquarters, the type of offense, and whether the accused should be separated from the service. Sometimes the evidence for the defense is not available to the convening authority prior to trial. The evidence presented may require a finding of Not Guilty; or, it may prove the accused guilty of a lesser included offense to that charged, or there may be extenuating circumstances in mitigation. In the latter cases, the court should adjudge a sentence appropriate thereto. In fixing a sentence, the court should bear in mind that there are three primary reasons for punishment. First, the old rule of retribution that has come down to us since biblical times that we must be punished for our sins, either here or in the hereafter, or both; second, in the case of serious crimes, it may be necessary to incarcerate the accused in order to protect the public from him; and third, the deterrent effect of a sentence upon others who might be similarly tempted. The court should adjudge an appropriate sentence, never, however, reaching the ridiculous. The imposition of a ridiculously light or heavy sentence, following conviction, greatly compromises the system of military justice.

"17. The court must use a great deal of common sense in arriving at an appropriate punishment. A careful reading of the forms of sentences will aid the court in arriving at a balanced, appropriate and adequate sentence. A court should not, through a misguided sense of sympathy for the accused's family, enter the field of rehabilitation. Since the beginning of recorded history, people have been seeking the means of punishing an individual for wrongdoing without also punishing the wife, children and parents. The solution to this problem has not been found. Rehabilitation lies with the commander, and should not be determined in the courtroom. As a court member, do not deprive the commander of his rights in this regard, or the accused of his opportunity to participate in a rehabilitation program and to gain the training and other benefits resulting therefrom. Rehabilitation is based on prolonged study and observation. Many facts are available to a commander in this study that are not available to the court. It is a continuing study, and the attitude of the prisoner during confinement may well be an important factor. It is general policy in the Air Force to return to duty as soon as possible a prisoner who ap-

pears to have rehabilitated himself. This policy is predicated not only on the desire to give each man an opportunity to turn over a new leaf and get back on the right track, but as well on a viewpoint of economy for the Air Force.

"18. Rehabilitation is not a part of your courtroom duties. You should adjudge a sentence appropriate to the offense committed, taking into consideration all the surrounding circumstances. You have a perfect right to recommend to the convening authority, individually or collectively, that clemency be exercised. Such recommendations are not a part of the sentence however, but should be forwarded to the convening authority following the conclusion of the trial. The trial counsel and defense counsel will assist you in preparing a recommendation for clemency."

Subsequent to the denial of his challenges for cause, defense counsel peremptorily challenged Lieutenant Colonel DeWitt and unsuccessfully sought a mistrial because of the exertion of command control.

In United States v Danzine, supra, and United States v Davis, supra, I made crystal clear my position that the importation into a trial of command desires with respect to either findings or sentence so deprives it of judicial character that instant reversal is demanded. Indeed, in United States v Olson, 11 USCMA 286, 29 CMR 102, we stated, at page 289:

". . . In such instances, the respect for command authority ingrained in the average officer predisposes him to judge the accused in the light of the needs of the service rather than impartially to consider the charges and the evidence. The result is drumhead justice—a situation which may as adversely affect discipline and morale as the offenses which originally led to the pretrial lectures."

The *Olson* case also involved bad checks. There, the president of the court was charged with implementation of a command program to eliminate worthless paper offenses and delivered the lectures regarding the program's effectuation to other court members. In spite of the insistence of each and every member involved that the program and directives would not influence their deliberations on either the findings or sentence and that such were intended only to govern the investigation of purportedly worthless checks, we reversed. Indeed, we went beyond the relief for which appellate counsel prayed—a rehearing on the sentence alone—and remanded the case for a complete rehearing.

In this case, the facts even more strongly demand reversal. While each of the court members in *Olson,* supra, alleged that he would not be influenced by the bad check program, the record before us establishes beyond cavil that Majors Baglio and Ashley intended to utilize the policies which the directives set forth in reaching findings of guilty and determining an appropriate sentence. In short, what was left only to "a fair risk" in the *Olson* case is here made express.

Dependence upon the bad check directives alone as evidence of the command control brought to bear upon this court-martial is, however, not necessary. Here, the staff judge advocate of the local command had issued directives which constitute palpable violations of Code, supra, Article 37. Indeed, in its brief, the Government "necessarily" concedes the "impropriety" of the original letter and argues only that it did not serve to influence the court members, principally because of its issuance almost two years prior to the trial and its replacement by the new directive on July 11, 1961. These are also the circumstances upon which my brothers rely in finding an absence of command control here. Once again, I must disagree.

Major Ashley indeed denied having read or being familiar with the admittedly offensive directive. Major Baglio, however, indicated he generally accepted the theories which it propounded, and he was not aware that the new letter in any way changed the

former, improper depiction of a court-martial's function and responsibilities. His testimony reveals beyond cavil blind acceptance of the thought that, once a case had been the subject of "a thorough study," and referred to a court-martial for trial, "a sentence of the type *not* authorized for a lesser court is appropriate." (Emphasis supplied.) In other words, where charges were referred to trial by general court-martial, he operated under the assumption that it was improper to consider any sentence less than a dishonorable discharge. Cf. United States v Zagar, 5 USCMA 410, 18 CMR 34.

Moreover, the fact that the original letter was replaced with a new directive on July 11, 1961, should have no palliative effect on the situation before us. In the first place, at least one court member did not understand that it in any way altered the policies set forth in the first letter. In the second, it appears that his conclusion is soundly premised, for a comparison of the two documents, both quoted above, reveals that the second merely repeated the earlier injunctions, albeit in milder terms. Thus, it reiterates the declaration that "each case is referred to the lowest type of court which has the power to adjudge an appropriate and adequate punishment," after consideration of all the circumstances, including "whether the accused should be separated from the service." Moreover, the only excuses for not adjudging a sentence within the competence of the type of court trying the case is whether there are factors introduced which were not presented to the convening authority prior to trial or whether there were unexpected findings of guilty of a lesser offense. Finally, imposition of "ridiculously light or heavy" sentences are said to "greatly" compromise the military justice system.

I find little distinction between these instructions and those which the Government admits were inexcusably in violation of Code, supra, Article 37. Both clearly inform court members that general courts-martial should adjudge punitive discharges on the ground that the convening authority would not otherwise have referred the case for

trial. And while my brothers emphasize the date of the early directive, the replacement letter was prepared only two days prior to the opening of accused's trial. Thus, not only did the admittedly illegal instruction remain in effect until just prior to the trial, but it was superseded only by a document equally offensive.

In United States v Kitchens, supra, we reversed solely because an assistant staff judge advocate at Fort Jackson, South Carolina, indicated in a pretrial letter to court members a desire personally to learn the motivation for various sentences which did not include punitive discharges. In that case, the letter was withdrawn before accused's trial by a second missive which reiterated that the original had been intended solely as a personal quest for information. We castigated the author of the letters and characterized the first inquiry as an attempt to compel inclusion of punitive discharges in general courts-martial sentences and the second as an obvious device to undermine any subsequent defense claim of command control. See also United States v Smith and United States v Barrett, both supra.

As noted at the outset, I believe our decisions in these three cases compel reversal here. What was hidden under the cover of an informational inquiry there is boldly stated upon this record. Major Woodcock made it quite plain that only general court-martial sentences would be acceptable from such tribunals and, as some of the members were attached to his command, it is immaterial it was his unit, rather than the actual convening authority, who issued the instructions. Indeed, command influence is more real at that level, for it is to his immediate superior that a court member must look for efficiency reports, leaves, quarters, and other factors which most directly affect the attractiveness of his career. And it is unfortunately yet true that:

". . . In the general course of human nature, a power over a man's subsistence amounts to a power over his will." [Hamilton, The Federalist No. 79 (Cooke ed 1961), page 531.]

230

In sum, then, I am convinced that the bad check directives in this case were so imported into the courtroom that certain members felt bound to utilize the judicial process to accused's detriment in order to attain a command objective. More importantly, at least one of the members consistently stated his intention to abide by the illegal command instructions on military justice, which had been replaced by others which I find equally in violation of the law. Under the circumstances, accused did not receive a fair trial, and his case should be reversed. I remind my brothers that only such summary action will serve to require observance of the Congressional mandate contained in Code, supra, Article 37, for, though this Court has sat for eleven years, and reviewed numerous records involving the issue, we have yet to see a single person brought to trial for violation of an accused's right to an impartial hearing. Reversal, therefore, remains the only shield to which an accused may look for protection against arbitrary interference.

I would reverse the decision of the board of review and order a rehearing to be held in another command.