UNITED STATES, Appellee

v

CARL T. DAVIS, JR., Specialist Five, U. S. Army, Appellant

12 USCMA 576, 31 CMR 162

No. 14,824

December 22, 1961

*First Lieutenant Ira M. Lechner* argued the cause for Appellant, Accused. With him on the brief was *Lieutenant Colonel Ralph W. Wofford.*

*Captain Stanley M. Wanger* argued the cause for Appellee, United States. With him on the brief were *Lieutenant Colonel James G. Mc-Conaughy* and *First Lieutenant Francis J. Larkin.*

## Opinion of the Court

KILDAY, Judge:

### I

Accused was arraigned before a general court-martial on charges and specifications alleging six offenses in violation of the Uniform Code of Military Justice. He pleaded nct guilty and, after a trial on the merits, the court returned findings of guilty on three counts. He was sentenced to a bad-conduct discharge and reduction to the lowest enlisted grade. The proceedings were approved by the convening authority, and thereafter a board of review affirmed. We granted further review to consider a number of issues. After the initial oral arguments, we set the case down for another hearing to permit consideration of the issues by the full Bench.

### II

Initially, we inquire into the critical question of whether a military law lecture, given to the court members before trial by the convening authority and his staff judge advocate, constitutes improper command influence or control inimical to accused's rights and interests. If it does, reversal is, of course, required. For the purpose of making this determination, and to identify the questioned remarks as to source and content, we note that the personnel and the lecture are the same as were involved in United States v Danzine, 12 USCMA 350, 30 CMR 350. See also United States v Jones, 12 USCMA 373, 30 CMR 373. The Government asserts that those decisions are controlling, while appellate defense counsel strongly urge that we review those holdings. The issue divides my brothers and, for that and other reasons, it is appropriate that we reconsider the question.

The proscription against command control is found in Article 37, Uniform Code of Military Justice, 10 USC § 837. That statute, entitled "**Unlawfully influencing action of court,**" provides:

"No authority convening a general, special, or summary court-martial, nor any other commanding officer, may censure, reprimand, or admonish the court or any member, law officer, or counsel thereof, with respect to the findings or sentence adjudged by the court, or with respect to any other exercise of its or his functions in the conduct of the proceeding. No person subject to this chapter may attempt to coerce or, by any unauthorized means, influence the action of a court-martial or any other military tribunal or any member thereof, in reaching the findings or sentence in any case, or the action of any convening, approving, or reviewing authority with respect to his judicial acts."

The language does not appear to be of doubtful or obscure meaning nor subject to more than one construction and, of course, the rule is well settled that a plain and unambiguous statute is to be applied, not interpreted. Where no ambiguity is apparent there is no reason to resort to rules of statutory construction, which are intended solely to remove—not create—doubt. See Russell Motor Car Co. v United States, 261 US 514, 67 L ed 778, 43 S Ct 428 (1923); United States v Dickenson, 6 USCMA 438, 20 CMR 154; United States v Hicks, 6 USCMA 621, 20 CMR 337. See also, generally, 50 Am Jur, Statutes, § 225; and 82 CJS, Statutes, §§ 311, 322b (2), and 356.

The plain language of Article 37, supra, then, should be considered in the context of the Uniform Code as a whole. When that is done I am, perforce, persuaded that orientation lectures or other instructions pertaining

to military justice, emanating from the convening authority and given to court-martial personnel, are not *per se* outlawed by the Uniform Code. Significantly, the statute involved does not flatly proscribe any and all participation by "command" in this phase of military justice. To the contrary, what was prohibited was coercive and other improper or unauthorized interference. Indeed, the title of Article 37 itself expressly and concisely spells out that the evil to be prevented is *unlawful* influence.

For those reasons, I question the wisdom of resorting to construction to discern the import of the codal provision in question. However, in past cases involving essentially this same point of law, reference has been made to extrinsic factors. Specifically, guidance has been sought in the legislative history of the Code. In view of that fact, and because I deem it important that this issue be finally resolved, I set forth a short exposition of my conclusions in that regard.

As was correctly noted in United States v Littrice, 3 USCMA 487, 13 CMR 43—one of the early cases to come before this Court, and involving facts somewhat similar to those before us in the present instance—the scope of command influence was one of the most controversial issues concerning military justice, not only during the period the Uniform Code was under consideration but also prior to that time. This and other phases of command control engaged the attention of Congress and of organizations, bodies, and individuals either connected with the armed services or otherwise interested in the administration of military justice. United States v Littrice, supra; United States v Grow, 3 USCMA 77, 81, 11 CMR 77; United States v Gordon, 1 USCMA 255, 257, 2 CMR 161. Rearguing the concepts set forth in those cases would be the work of supererogation. Suffice it here to invite attention to the rationale of those decisions. To state it briefly, many and respectable were the authorities who recommended that command be entirely divorced from military justice; that control of courts-martial proceedings must be stripped from commanders. Congress, however, obviously rejected such a restrictive view and sought to strike a balance whereunder "courts-martial members [were freed] from any improper and undue influence by commanders which might affect an honest and conscientious consideration of the guilt or innocence of an accused." 3 USCMA at page 491. Article 37 of the Uniform Code of Military Justice, supra, set forth hereinabove, was the result.

Well-nigh conclusive evidence that the last-mentioned Article does not entirely outlaw lectures to court members by convening authorities are the factors relied upon by Judge Brosman in his concurring opinion in *Littrice*, which are in harmony with my conclusions. It must be remembered that the Uniform Code was not the first post-World War II review of the administration of military justice. Rather, the Congress had previously passed the Elston Act which, although not applicable to all services, is the precursor of the present Code. In that legislation, after consideration of substantially similar complaints about military justice generally and command control in particular, Congress adopted Article of War 88. Parenthetically, it should be noted that statute is essentially identical to Article 37 of the Uniform Code, supra. It provides as follows:

"ART. 88. Unlawfully Influencing Action of Court.—No authority appointing a general, special, or summary court-martial nor any other commanding officer, shall censure, reprimand, or admonish such court, or any member thereof, with respect to the findings or sentence adjudged by the court, or with respect to any other exercise, by such court or any member thereof, of its or his judicial responsibility. No person subject to military law shall attempt to coerce or unlawfully influence the action of a court-martial or any military court or commission, or any member thereof, in reaching the findings or sentence in any case, or the action of an appointing or reviewing or confirming authority with respect to his judicial acts."

And in implementation of that provision, the Manual for Courts-Martial, U. S. Army, 1949, expressly permitted general instructions to a court-martial by commanders. See paragraph 87*b* thereof at page 92.

It was in that background, with the two foregoing provisions in force, that the question of command control was considered anew by the Congress before the enactment of the Uniform Code. Yet, despite full awareness of the provisions of 87*b* of the 1949 Manual, supra, and notwithstanding complaint by highly respected authorities that Article of War 88 and proposed Article 37 of the Uniform Code were not sufficient to eliminate the evil of command influence from the administration of military justice and could easily be circumvented, Congress adhered very closely to Article of War 88 of the Elston Act, supra, and enacted Article 37, Uniform Code of Military Justice. See Hearings before House Committee on Armed Services, 81st Congress, 1st Session, on H.R. 2498, pages 643 and 644; and Hearings before Senate Committee on Armed Services, 81st Congress, 1st Session, on S. 859 and H.R. 4080, page 209. No action was taken to alter, amend, or in anywise abrogate the prior practice and invalidate all pretrial conferences.

Under those circumstances there can be little question but that a well-defined administrative interpretation was extant under a prior statute which was substantially re-enacted as Article 37 of the Uniform Code. Beyond cavil this was not unwitting action or oversight on the part of Congress, but constitutes a recognition and ratification of prior interpretation. Not only was the matter specifically presented to Congress, but additionally it should be noted Article of War 88 was altered in rather unimportant detail in re-enacting it as Article 37.

As Judge Brosman stated, Congress in this instance very apparently made a knowing election. 3 USCMA at page 496. From the foregoing, the wisdom of the rule that statutes shall be construed from their context unless they be ambiguous is confirmed. Beyond peradventure, under the present statute, instructions by the convening authority or lectures to court-martial members are not, *per se,* prohibited and, therefore, not, *per se,* prejudicial.

Thus, I subscribe unreservedly to the prior holdings of this Court, which are in accord with the foregoing concepts. Reference to other occasions upon which the allegation has been improper command influence demonstrates. conclusively that the subject matter of military justice lectures is the critical consideration, and not whether they are beamed to court members alone. See United States v Littrice, supra; United States v Isbell, 3 USCMA 782, 14 CMR 200; United States v Navarre, 5 USCMA 32, 17 CMR 32. Patently, were the fact that the remarks were made the sole important question, rather than the content and substance of the lecture, it would not be necessary to treat with the latter factor as we have repeatedly done.

Neither are we swayed by the argument that it was prejudicially improper for the convening authority to have delivered the lecture rather than his staff judge advocate. In that connection, paragraph 38, Manual for Courts-Martial, United States, 1951—which seems to be a revision of paragraph 87*b* of the 1949 Manual, supra—indeed indicates orientation should be given through a staff judge advocate or legal officer, when such officers are present in the command. Suffice it to say that we read paragraph 38 as being merely advisory in nature. Surely it is no more than directory, and not mandatory.

So much for that matter. In *Danzine* the circumstances indicated the lecture had not improperly influenced the court-martial, and the same is true here. In the case at bar, *voir dire* examination conducted by the defense concerning the effect of the lecture, indicated the court members were not influenced in their deliberations. Moreover, it is apparent that this court-martial was not oriented disfavorably against accused, for he was acquitted of three major offenses charged. Additionally,

the adjudged sentence does not include either confinement or forfeitures. We conclude, therefore, that accused was not prejudiced by the content of the lectures. United States v Danzine, supra, and cases therein collated.

Before leaving this issue, it is appropriate to point out that pretrial lectures or conferences ▉▉▉▉▉ ▉ should be carefully limited to general orientation on the operation of court-martial procedures and the responsibilities of court members. They should not suggest, directly or indirectly, that the findings or sentence in a particular case may be based on matters outside the record of proceedings before the court-martial. Cf. United States v Marshall, 12 USCMA 117, 30 CMR 117; with United States v Olson, 11 USCMA 286, 29 CMR 102, and United States v Mamaluy, 10 USCMA 102, 27 CMR 176.

I should, in all fairness, also invite the attention of the reader at this point to the fact that the remaining portions of this opinion are, in large part, the handicraft of the Chief Judge. Being in full agreement with his treatment, I am pleased to adopt the same substantially, and to acknowledge the effort my associate has put forth in preparation of the instant opinion, so that the work may properly be credited.

### III

One of the offenses of which the accused stands convicted is uttering a forged instrument, in violation of Article 123, Uniform Code of Military Justice, 10 USC § 923. In another assignment he contends the evidence is insufficient to show an intent to defraud. The argument is based principally upon the accused's insistence that he presented an agreement to purchase a car for $500.00 which bore a forged endorsement indicating payment in full, merely "to stall for time." In United States v Addye, 7 USCMA 643, 23 CMR 107, we held that a writing having apparent legal efficacy to advance the time for payment of money is an instrument capable of being the subject of forgery. Implicit in our affirmance of

the conviction in that case is the rule that an intent to defraud may be present when a false writing is made or uttered for the purpose of obtaining payment of money in advance of the prescribed time. In our opinion, intent to defraud also is present in a converse situation in which the intention is to defer the prescribed time of payment. In other words, a writing acknowledging receipt of the payment of money may be the subject of forgery. If such receipt is uttered with the intent to postpone or defer the prescribed or regular time of payment, there is an intent to defraud. It matters not whether, at that same time, the debtor intends ultimately to pay the debt. A good intention does not cancel out a coexisting evil intent. "If the law were otherwise there would be fewer convictions of crime, for there are few crimes in which extraneous motives are not mixed up with a particular evil motive." 1 Wharton, Criminal Law, 12th ed, § 155. Even in the light most favorable to the accused, therefore, there is sufficient evidence to support the findings of guilty of uttering a known forged instrument with the intent to defraud.

### IV

In a second assignment of error relating to the forgery, the accused maintains that he was prejudiced in the post-trial review because the staff judge advocate recommended to the convening authority that the conviction be affirmed on a theory different from that relied upon by the Government at trial. He contends trial counsel's theory was that the intent to defraud was evidenced by the accused's intention to impede his commanding officers in the performance of their responsibilities under paragraph 9, Army Regulations 600–10, December 19, 1958, concerning "Private indebtedness and financial obligations"; whereas, the staff judge advocate argued the evidence showed an intent "to 'cheat' Barnhill [the creditor] of his due." See United States v Bouie, 9 USCMA 228, 26 CMR 8. The record does not support the accused's complaint. Trial counsel's final argument

clearly indicates that the prosecution's theory was the accused intended to defraud his creditor. Thus, he said:

"The Law Officer will instruct you, gentlemen, on the elements of the offenses involved. The Law Officer will tell you that you must find, to find the accused guilty of forgery, that had he had the intention to defraud Jack H. Barnhill, he will tell you that to defraud means that he must have meant to obtain something of value by a trick or a cheat, or a misrepresentation from Barnhill.

. . . . . . .

"For that purpose he made a false official statement to Capt Travers. He said 'I have paid the $500 for the purchase of the automobile,' and again he made the same statement to Capt McKellipes so these men would not take action against him under Article 134. And his intention was not merely to stall for time as he would like to have the Court believe in Prosecution Exhibit 1. His intention at that time was to permanently defraud Barnhill. Remember, it had been July, August, September and October, before he was even called into the company commander's office and he hadn't sent him any money and now he wants you to believe that he suggests in a statement that he was just stalling for some time. Well, he was stalling for more time—meaning forever. He was going to evade that debt permanently. As a matter of fact he couldn't have done much else because he already had told by March 1960 two company commanders that the debt had been paid so how could he after that time turn around and pay the debt then? He would then be in the position of convicting himself of having made a false official statement so the intention must have been that he never would have paid that debt, even after March of 1960 when he realized the debt had never been paid by his wife and accepting his story, he made no attempt to even write Barnhill that he was sorry about what his wife had done and now I am going to start paying it off as soon as I can.

"He didn't do any such thing."

**582**

V

In two assignments of error the accused attacks the validity of the findings of guilty of specifications 1 and 2, Charge I. Each specification alleges that, with intent to deceive, the accused made a false official statement to his then commanding officer. The accused's commander, who was a different individual on each occasion, received a letter advising him that the accused had defaulted in the payment of installments of $25.00 a month, under an agreement for the purchase of an automobile for $500.00 from a fellow soldier. Proceeding in accordance with AR 600–10, supra, the commanding officer called in the accused to discuss the debt. In neither interview was accused advised of his rights under Article 31, Uniform Code of Military Justice, 10 USC § 831, preliminary to being questioned about the matter. To both commanders, the accused represented that the debt had been paid. He also exhibited his copy of the agreement on which were endorsed the word "Paid" and the initials "JHB," which initials corresponded to those of the complainant-creditor. Over defense counsel's objection, the accused's statements were admitted in evidence.

It was contended at trial that at each interview the commanding officer was required to advise the accused of his rights under Article 31 before questioning him about the transaction. Additionally, defense counsel maintained that, in any event, the statements were not "official" within the meaning of Article 107, Uniform Code of Military Justice, 10 USC § 907. Judge Ferguson would dismiss the specifications on the latter ground. See his dissent in United States v Reams, 9 USCMA 696, 26 CMR 476; cf. United States v Atkinson, 10 USCMA 60, 27 CMR 134. In our opinion, both contentions are doubtful under the posture of the instant record. However that may be, though, we conclude the circumstances make it unnecessary to consider the accused's contentions. United States v Subia, 12 USCMA 23, 30 CMR 23; United States v Keith, 1 USCMA 442, 449–451, 4 CMR 34. Nonetheless, in order to insulate accused from even the

most remote possibility of prejudice on findings, and since we can effect final disposition of the case without further proceedings, we are satisfied to join Judge Ferguson in dismissing those specifications.

Under the clearly valid forgery finding, accused stands convicted of uttering to his commander the instrument which falsely indicated the debt in question was discharged. Certainly this finding of guilty is for more serious criminality than the false statement specifications, and substantially embraces the general nature of the misconduct set forth in them. It is obvious that the challenged specifications are manifestly minor in relation to the other charges. Neither individually, nor in combination, do they authorize a punitive discharge; and the period of confinement for each is but three months. Manual for Courts-Martial, United States, 1951, paragraph 127c, sections A and B. It is apparent from the adjudged sentence, which imposes no confinement and no forfeitures of pay, that the false statement specifications played no significant part in the court-martial's deliberations. See United States v Helfrick, 9 USCMA 221, 25 CMR 483, and allied cases. Consequently, there is no sound reason to return the case to the board of review for reassessment of sentence.

For the reasons stated above, the decision of the board of review as to specifications 1 and 2, Charge I, is set aside and that charge and its specifications are ordered dismissed. In all other respects, the decision of the board of review is affirmed.

Chief Judge QUINN concurs.

FERGUSON, Judge (dissenting):

I dissent.

In my separate opinion in United States v Danzine, 12 USCMA 350, 30 CMR 350, I set forth fully my view that the lectures delivered to this court-martial by the convening authority and his staff judge advocate violated the provisions of Uniform Code of Military Justice, Article 37, 10 USC § 837, and, therefore, required that a rehearing be ordered. As the same lectures and the same court-martial are involved in this case, the rationale which I there expressed leads me to the conclusion that a rehearing is required here.

I would set aside the decision of the board of review and order a rehearing on the charged violation of Article 123, 10 USC § 923.