UNITED STATES, Appellee

v

CARL E. ALBERT, Private, U. S. Army, Appellant

16 USCMA 111, 36 CMR 267

No. 18,960

March 11, 1966

*Captain Francis R. Jones* argued the cause for Appellant, Accused. With him on the brief were *Colonel Joseph L. Chalk* and *Lieutenant Colonel Martin S. Drucker.*

*Captain Robert B. Lee* argued the cause for Appellee, United States. With him on the brief were *Colonel Joseph J. Crimmins, Lieutenant Colonel Francis M. Cooper,* and *Captain John D. Jackson.*

## Opinion of the Court

QUINN, Chief Judge:

The accused contends he was deprived of a fair trial and a fair review of his conviction by command influence. The contention is based upon a lecture given by the Staff Judge Advocate, Fort Devens, Massachusetts, on March 20, 1965, to officers at the Post, some of whom were members of the court-martial which later tried him.

On April 27, 1965, before a general court-martial convened at Fort Devens, the accused entered a plea of guilty to desertion, terminated by apprehension, escape from confinement, and breach of parole, in violation of Articles 85, 95, and 134, Uniform Code of Military Justice, 10 USC §§ 885, 895, and 934, respectively. He was convicted as charged. Although subject to a maximum punishment of confinement at hard labor for four and one-half years, forfeiture of all pay allowances, reduction to the lowest enlisted grade, and a dishonorable discharge, he was sentenced to confinement at hard labor for eighteen months, reduction to the lowest enlisted grade, forfeiture of $52.00 per month for eighteen months, and a dishonorable discharge. In his post-trial interview, he indicated he was needed at home and had no desire to be restored to duty. In accordance with a pretrial understanding with the convening authority, the dishonorable discharge was changed to a bad-conduct discharge and the period of confinement was reduced from eighteen months to one year.

At trial, there was no *voir dire* of the court members as to whether they attended the staff judge advocate's lecture and, if so, whether it had any influence upon them. In his petition for grant of review, the accused assumed that the members of the court-martial necessarily attended the lecture because they were assigned to Fort Devens at the time. The Government conceded that five of the seven court members actually attended the lecture. The concession has not been withdrawn. Accordingly, we can put aside consideration of the validity of the accused's assumption, and accept as an established fact that members of the court-martial attended the lecture. We turn, therefore, directly to the substance of the lecture. See United States v Davis, 12 USCMA 576, 31 CMR 162.

The indicated primary purpose of the lecture was to define the duties and responsibilities of members of courts-martial. At the outset, the staff judge advocate expressed alarm at the "numerous requests" for excuse from court duty. He noted that service on a court-martial was important duty. "[N]othing," he said, "will increase morale more than the effective, speedy, impartial and fair administration of military justice"; and nothing diminishes morale more "than slow, ineffective, partial or unfair treatment by courts-martial." After emphasizing the importance of court-martial duty, he pointed out that it was subject to "continuing change." Briefly, he commented on various recommendations for change, from a period before the Uniform Code of Military Justice to bills introduced in the Senate in the current session of Congress by Senator Sam J. Ervin, Chairman of the Subcommittee on Constitutional Rights of the Senate Committee on the Judiciary, and other bills sponsored by the Armed Services which had been introduced in the House of Representatives. He listed the objectives of these bills. One, he pointed out, expanded the prohibition against com-

112

mand control of courts-martial. Interpolating, he assured his listeners he had reviewed the text of his own talk "thoroughly" to avoid any implication that he desired to "influence you in your decisions as present or potential court members."

After this general discourse, the staff judge advocate turned to the procedure used at Fort Devens for the selection of members of courts-martial. He covered a number of problems. He pointed out that the commanding general personally appointed and personally excused a prospective court member. He asked that no one selected for court duty "take it out" on the member of his staff who might call to advise the member of his appointment and of the trial dates. He estimated the probable number of times a particular general court-martial might be convened, and the number of cases it might hear at any one session. He also reviewed the jurisdiction and punishment powers of the various courts, and discussed the overall procedure of a general court-martial. Then he discussed the "specific" responsibilities of court members.

The enumeration of the special responsibilities indicated that "[f]irst and foremost" court members were jurors. Court members, it was said, must never let "their personal feelings control their decision"; if that occurs, "our system of justice fails." The staff judge advocate advised his audience that court members took an oath to decide a case impartially and in accordance with the evidence. A court-martial was "no place for prejudice, bias, or personal feelings," and service on a court required common sense and attentiveness to the proceedings. Each person in the audience was asked to "[i]magine how you would feel if you were on trial," and a court member fell asleep, doodled or gazed out the window during the trial. Such conduct was unfair to the accused, unfair to the Government, and reflected "no credit" upon the court member.

After commenting on the attitudes and conduct expected of a court member, the staff judge advocate turned to the matter of courts-martial sentences. He began with the general statement that an appropriate sentence must be determined in *"each particular case,"* and proceeded to elaborate on the various factors which should be considered. First, he referred to the nature of the offense. He pointed out the general difference between a felony and a misdemeanor, describing the former as an offense in which the maximum punishment exceeded confinement for more than one year, and the latter as an offense carrying a lesser punishment. Illustrations of each offense were given. Next, he called attention to the necessity of considering "aggravating circumstances," such as brutality in a beating, and "mitigating circumstances," such as poor education or extreme youthfulness. He reminded the audience that the sentence procedure was also "no place for . . . personal feelings," and "[y]ou shouldn't consider what you think the convening authority would like; it is your responsibility, and your's alone, to determine an appropriate sentence." At that point, he undertook to explain "the effect" of certain sentences. It is this part of the lecture which the accused contends represents a command effort to influence prospective courts-martial members in the audience to include additional penalties in the sentences.

First, the staff judge advocate discussed the effect of a sentence to a punitive discharge but with no confinement or forfeitures. With such a sentence, the accused remained in a full duty status and was entitled to pay and allowances, pending completion of appellate review. The staff judge advocate argued, "most people in such a situation" do not "give a damn" what they do; they get into more trouble and "lead other soldiers . . . into trouble." However, he cautioned his listeners not to "misunderstand" him; he was certain there were cases in which a punitive discharge alone was an appropriate sentence, but he urged them to judge

"each case on its own merits," considering the "individual involved."

Next, the staff judge advocate referred to a sentence extending to a punitive discharge and total forfeitures, but not including confinement. Such a sentence, the staff judge advocate noted, also left the accused in a full duty status, but he could not get paid. "[W]e," he said, "cannot have a soldier on active duty . . . without paying him." Two courses to alleviate the problem were available: Execution of the forfeitures could be withheld until final approval of the conviction; or the forfeitures could be reduced and ordered executed in the reduced amount. Neither action was thought to be consistent with "what the court believed . . . [to be] appropriate," but one or the other had to be taken because a full duty status without pay was contrary to custom.

A third type of problem sentence was that providing for long confinement (two or three years was mentioned as an illustration) and partial forfeiture of pay. Since no discharge was included, at the end of his confinement the accused was entitled to return to duty. The staff judge advocate indicated the Department of the Army did not favor that kind of situation, and, therefore, normally reduced the period of confinement to six months. As a result, the desires of the court-martial were "not carried out." The staff judge advocate said he did not know what prompted a court-martial to impose a sentence of this kind, unless it believed the accused would "be boarded out of the service." He observed such board proceedings could not be taken, in view of a recent change in Army regulations prohibiting an administrative discharge for misconduct which was the subject of a court-martial (AR 635–200, paragraph 8, Change 11).

Another aberrant sentence was the one which imposed confinement, but no forfeitures. Under such a sentence, the accused will just "be sitting in jail, doing nothing," but draw full pay and allowances. It seemed to him that this kind of sentence might be

appropriate in "a few cases of extreme hardship," but it appeared to be "incongruous" for the accused to go to jail "for six months or more" and yet receive full pay and allowances.

The next sentence situation discussed was one which "occurs occasionally in a special court-martial." This was the case of a sentence to confinement at hard labor and reduction to an intermediate grade. Referring to Article 58a, Uniform Code of Military Justice, 10 USC § 858a, the staff judge advocate noted that reduction to the lowest enlisted grade results automatically from a sentence to confinement at hard labor or hard labor without confinement. Consequently, reduction by a court-martial to an intermediate grade was "inconsistent." To accord the accused the benefit of any doubt as to the court-martial's intention in imposing a sentence of this kind, the confinement, the staff judge advocate argued, "must be set aside" on review.

Finally, the staff judge advocate considered the sentence providing for hard labor without confinement. This sentence, he said, is hard to administer because the work performed by a regular duty soldier may be harder than that required of the accused in execution of the sentence. He asked the listeners to consider this "effect" in imposing such a sentence; and he cited a case in which the effect on the "morale" of the regular duty soldiers was "devastating."

The staff judge advocate concluded the lecture by expressing the hope that he had provided a better understanding of the duties of a court-martial member and a better understanding of the meaning and effect of the various sentences imposed by courts-martial. He again emphasized that he did not want "to be charged with command influence."

The responsibility of the members of a court-martial is to determine, impartially and according to the evidence, the accused's guilt or innocence, and if it finds the accused guilty, to impose an appropriate sentence on the

basis of all the matters presented to it. Court members are not concerned with administrative problems incident to the execution of a sentence. See United States v Quesinberry, 12 USCMA 609, 31 CMR 195; United States v Olson, 7 USCMA 242, 22 CMR 32. Consequently, they should not be troubled with, or confused by, instructions on possible consequences that might result from certain types of punishment. United States v Pajak, 11 USCMA 686, 29 CMR 502. It is difficult, therefore, to see the need for the staff judge advocate's complaint about certain sentences in a lecture intended to acquaint officers with their "duties and responsibilities" as court members. However, we are not concerned with the soundness of his criticism. See United States v Dean, 5 USCMA 44, 50, 17 CMR 44. Our interest is in the substance of the lecture; specifically, whether it presents at least a fair risk that the court members who attended it would be inclined to impose a sentence of a particular kind merely to obviate the problems mentioned by the staff judge advocate.

We have summarized the whole of the lecture because its impact upon prospective court mem‑ ▮ bers can be judged only as a whole. United States v Danzine, 12 USCMA 350, 30 CMR 350. So viewed, it impresses us as a rather commonplace discussion of the problems in the selection of members of a court-martial and of the general responsibilities of a court member. Its only alien element is in the criticism of certain kinds of sentence. Assuming, as appellate defense counsel contend, the criticism is, in some respects, erroneous, we cannot interpret it as an exhortation for more severe sentences generally, or for the inclusion in every sentence of a punitive discharge, forfeitures in some amount, and confinement at hard labor for some period. Cf. United States v Kitchens, 12 USCMA 589, 31 CMR 175. True, the discussion of a sentence to hard labor without confinement comes close to asking prospective members to substitute confinement at hard

labor for that type of penalty. Even this discussion, however, is qualified by the clear implication that a sentence to hard labor without confinement is a problem only when the tasks assigned to the accused are less onerous than those of persons on regular duty. This is patently a problem in the execution of a sentence, not its imposition.

As we construe the last part of the lecture in context, we are satisfied that it was intended by the staff judge advocate as a plea for careful consideration of the factors that affect the particular accused, rather than as a direction to include, at all times and under all circumstances, certain combinations of punishment. Our reading of the transcript convinces us that prospective court members among his listeners would, in the words of the lecture, conclude they "alone" had the responsibility to determine "an appropriate sentence, under all the facts and circumstances" of the case, and they were to fulfill that responsibility without considering "what . . . the convening authority would like." See United States v Navarre, 5 USCMA 32, 17 CMR 32. The leniency of the punishment imposed by the court-martial in relation to the maximum penalty reflects a freedom of decision that belies obedience to the alleged dictates of the lecture. Also, the sentence compares favorably with that which, before trial, the accused described as "lenient" and which he asked the convening authority to approve. See United States v Davis, supra, page 581. Cf. United States v Johnson, 14 USCMA 548, 553, 34 CMR 328.

Our conclusion as to the import of the lecture is equally dispositive of the accused's contention that it disqualified the staff judge advocate from participating in the post-trial review. Accordingly, we affirm the decision of the board of review.

Judge KILDAY concurs.

FERGUSON, Judge (dissenting):

I dissent.

With cases such as this, the Court

sounds a death knell for the provisions of Uniform Code of Military Justice, Article 37, 10 USC § 837, which provides:

"No authority convening a general, special, or summary court-martial, nor any other commanding officer, may censure, reprimand, or admonish the court or any member, law officer, or counsel thereof, with respect to the findings or sentence adjudged by the court, or with respect to any other exercise of its or his functions in the conduct of the proceeding. No person subject to this chapter may attempt to coerce or, by any unauthorized means, influence the action of a court-martial or any other military tribunal or any member thereof, in reaching the findings or sentence in any case, or the action of any convening, approving, or reviewing authority with respect to his judicial acts."

The only logical or intended inference of these lectures is to dictate to the members the need to eliminate those problems by adopting and announcing sentences which include a punitive discharge, forfeiture of all pay and allowances, and confinement at hard labor. And this is true despite the staff judge advocate's formal admonition that he wished to avoid any implication he desired "to influence you in your decisions as present or potential court members" or "to be charged with command influence."

There was simply no other reason to give the lecture, except to provide command guidelines for what was considered to be an appropriate sentence. The Government advances none; none appear from the context of the lecture; and even my brothers were unable to marshal an argument which would justify what was done here. Indeed, the very admonitions of the staff judge advocate indicate his guilt rode heavy upon his conscience. Despite his disclaimers, therefore, I must regretfully level a charge of deliberate command control at his head —regretfully, as he is a lawyer and an officer, and thus doubly obliged to uphold the law for whose breach he seeks others' punishment but, with impunity, violates himself.

The entire lecture was delivered to the court members at Fort Devens, in the presence of their Commanding General, and is annexed hereto as an appendix. I have no argument with the manner in which my brothers have summarized it, but to add emphasis to what I deem its pernicious effect, I necessarily must not only repeat the points which it made regarding the imposition of "proper" sentences, but also establish beyond cavil the context in which they were uttered.

The staff judge advocate initially referred to sentences extending only to a punitive discharge. While he pointed out the difficulties allegedly caused the Army by accused so sentenced, who were said to remain on a full duty status pending completion of appellate review, he said nothing of the fact that, as we have held, it is open to a commander to take appropriate measures for the restraint of an accused pending execution of the discharge in order to prevent just those difficulties. See United States v Howard, 2 USCMA 519, 10 CMR 17. Indeed, if situations as he depicted have arisen, the fault lay not with the court-martial for doing its independent duty of adjudging what it considered to be an appropriate sentence, but with the command in failing to take those measures authorized to prevent the vice of which the staff judge advocate so querulously complained.

Secondly, the staff judge advocate dealt with sentences which extended no further than punitive discharge and total forfeitures, pointing out that the forfeitures could not be ordered into execution, as adjudged, until the completion of appellate review. This, he criticized on the basis that the convening authority could not effectuate the punishment which the court deemed appropriate. He seemed to believe the appropriate remedy for the court was to add confinement to the sentence, thereby grossly increasing its severity, merely to avoid paying the accused! That such is a scarcely

veiled attempt to influence the court members cannot be doubted.

Thirdly, the staff judge advocate took up the "problem" of sentences which adjudged long periods of confinement without also ordering a punitive discharge and total forfeiture of pay. He told the officers that confinement in these cases was normally reduced to six months, but the Government does not contravene the suggestion of appellate defense counsel that this was not a correct statement of Department of the Army policy. Indeed, we have recently had before us a homicide case in which the approved sentence extended to confinement at hard labor for three years and a partial loss of pay for a like period. United States v Strong, 16 USCMA 43, 36 CMR 199. And one cannot peruse the pages of the transcript therein without at once agreeing the court-martial did not abuse its powers in determining a punitive discharge was not an appropriate punishment for the accused's crime. Once more, however, this "problem" was nothing but further dissembling on the part of the staff judge advocate to impress the court members a punitive discharge was an essential part of every sentence.

Fourthly, the staff judge advocate criticized sentences which adjudged confinement without any forfeitures, on the basis the accused then did nothing but sit around a jail and draw pay for his enforced idleness. Again, we judicially know this is not true. Not only do pertinent service regulations provide for the useful labor of prisoners in stockades and disciplinary barracks, but we have been confronted with such instances in records before us. See, for example, United States v Woolbright, 12 USCMA 450, 31 CMR 36, in which they were assigned the task "of enlarging a sand trap on the ninth green of a golf course being constructed at Fort Leonard Wood." Id., at page 451. Again it would appear the staff judge advocate sought, with busy invention, to paint such a picture of indolence that the court members would, righteously and economically, adjudge total

forfeitures of pay in all future cases. Once more, the emphasis is squarely placed on that which command considered to be an essential element of every "appropriate" sentence.

Finally, mention was made of other lawful, albeit less harsh, sentences, such as confinement or hard labor without confinement with reduction to an intermediate grade, and hard labor alone. Excuses likewise were found to exclude them from the category of appropriate sentences as inconsistent or difficult to administer. Once more, the emphasis is left on the need for every sentence to include, as essential elements, a punitive discharge, total forfeiture of pay and allowances, and confinement at hard labor.

Nor does the foregoing complete the picture of sentence control painted by the staff judge advocate. What was omitted by him is equally important. Thus, while emphasizing inconvenience to the Government in each instance outlined, he did not discuss the awful and very real consequences to an individual of a punitive discharge; nor did he point out the impact of confinement on a youthful offender or one with an innocent family; nor did he discuss how elimination of income may serve to penalize, not the accused, but his wife and children. Never did he mention the need in each case to consider the individual circumstances, which, though not legal in nature, are the source of that temperance and mercy which must needs characterize every sentence returned by a jury as appropriate in its eyes —the only bar at which it may in this world be lawfully called to answer for its actions. Rather, his silence as to anything which a court-martial might find favorable to a particular accused generated the inevitable conclusion that all sentences to be adjudged must be gauged by the test of whether inconvenience to the United States would result and, just as inevitably, that, in order to avoid such inconvenience, every "appropriate" sentence must necessarily extend to a punitive discharge, forfeiture of all pay and allowances, and confinement at hard labor.

Thus, I am led to find beyond any peradventure of a doubt, that the lecture here was intended to, and did, influence its hearers to adjudge harsher sentences within the framework laid down by the command structure of Fort Devens. As such, it violated the express terms of Code, supra, Article 37, and constituted unlawful command control.

I cannot explain or understand the differing view of my brothers, who simply refuse to reach this rather obvious conclusion, but at the same time, offer no alternative construction. Certainly, the staff judge advocate's language must be taken in context, but, as the appended document will demonstrate, I have not sought to characterize it *in vacuo*. Surely it is not enough to say that a staff judge advocate is guiltless, because he states he does not intend to interfere with the freedom of court members and, then for pages, does just that! Yet, that is the only reed to which the principal opinion can cling. I dismiss it as unimportant and unworthy of consideration, in light of the purpose he, on the whole, so glaringly displayed. See my dissenting opinions in United States v Danzine, 12 USCMA 350, 30 CMR 350, and United States v Davis, 12 USCMA 576, 31 CMR 162.

Indeed, had this lecture been delivered as instructions by the law officer of a general court-martial to its members, we would not have hesitated to reverse. United States v Fowle, 7 USCMA 349, 22 CMR 139; United States v Estrada, 7 USCMA 635, 23 CMR 99. My brothers concede it is the duty of a court-martial to limit itself to matters of record in performing its exclusive function of initially determining the appropriateness of sentence, United States v Olson, 7 USCMA 242, 22 CMR 32, and that administrative problems of command may not be brought to their attention. United States v Quesinberry, 12 USCMA 609, 31 CMR 195; United States v Pajak, 11 USCMA 686, 29 CMR 502. Why then is the error less reprehensible when done directly by an outsider, forbidden by law to invade the court's function? The answer to me is obvious. One can imagine the result in civil judicial systems if a venire was permitted to hear reports from the Attorney General, delivered at the instance of the Governor, on the need for particular sentences! The same result must obtain in the military judicial system if it is to retain its character as such and not regress to the status of a committee advising the convening authority on punishment.

In sum, then, I would find the existence of disqualifying command interference present in this case, calling for reversal *per se*. Dissenting opinions, United States v Davis and United States v Danzine, both supra; United States v Kitchens, 12 USCMA 589, 31 CMR 175. When my brothers find themselves unable to join in this conclusion, I believe they err so fundamentally, albeit honestly, as to make the provisions of Code, supra, Article 37, a dead letter, except in the most direct and reprehensible cases. Holdings such as this will only weaken public confidence in military justice, and rightly so. Nor may the armed services derive any comfort from them, for they will as surely lead an aroused Congress to more restrictive and detailed legislation, determined now, as before, to insure the absolute and unqualified independence of military judicial tribunals—and all because one staff judge advocate tired of being "inconvenienced" by sentences which local courts-martial undoubtedly thought appropriate for the offenses and offenders before them.

I would reverse the board of review and order a rehearing on the sentence.

## APPENDIX

General Evans—

Ladies and Gentlemen—

I have requested this meeting today primarily to discuss with you the duties and responsibilities of members of courts-martial. I have become alarmed at the numerous requests to be excused from court duty, and the number of complaints I hear about having to serve as members of our

various types of courts-martial. Apparently, all our officers, senior or subaltern, have forgotten that primarily Army service is leadership or the proper handling of men. A basic part of leadership is to maintain morale. And nothing will increase morale more than the effective, speedy, impartial and fair administration of military justice, or conversely nothing will diminish morale more than slow, ineffective, partial or unfair treatment by courts-martial. Gentlemen, you are the pool for court members. Such service on courts is one of the most important duties of any officer. It has been said that court-martial duty takes precedence over all other military duties, and while this might be carrying matters to the extreme, it is certainly an indication of the importance Department of the Army places on the administration of military justice.

You may wonder why there is continuing emphasis placed on the proper administration of military justice. There is continuing emphasis and continuing training because there has been continuing change. Gentlemen, let me point out to you that on *two* occasions during my service of twenty odd years, major action has been taken in this field to change the rules. Many of the older officers will remember the recommendations of the Doolittle Committee, the Bolte Committee and others, the temporary changes reflected in the Manual for Courts-Martial, 1949, and then the promulgation of the Uniform Code of Military Justice which brought about the Manual for Courts-Martial, 1951, which became applicable to all services, Army, Navy, Air Force and the Coast Guard. Each year since 1951 there have been changes not only in the interpretation of the Manual provisions brought about by decisions of the Court of Military Appeals, but also changes in the Code itself.

Last year and this year the Ervin Committee headed by Senator Sam J. Ervin of North Carolina dumped 18 bills into the hopper that had to do with military justice. These bills if passed would have a broad impact on the various facets of military justice.

These bills propose among other things that: (1) There will be a Law Officer on administrative boards that can give a discharge other than honorable; (2) Counsel to be provided before waiver of administrative board proceedings where discharge other than honorable may be given; (3) The appointment of civilians to the trial judiciary to serve as Law Officers; (4) The right to demand trial instead of discharge board action in misconduct cases; (5) Discharge under other than honorable conditions is prohibited by board action if based on misconduct for which the respondent has been acquitted by court-martial; (6) Petition for review to the United States Court of Military Appeals and certification by The Judge Advocate General in all boards for correction of military records cases and discharge review board cases; (7) Abolition of Summary Court-Martial subpoena power for Article 32 investigations; (8) Prohibition of command influence in lectures by any person subject to the Uniform Code of Military Justice, not just by convening authorities. As an aside, gentlemen, you can be sure I have reviewed the text of this talk thoroughly so as to avoid any possibility that you might believe there was any intention on my part to influence you in your decisions as present or potential court members as to any case or group of cases; (9) The Committee has recommended a prohibition of efficiency reporting on military justice matters in the chain of command. This has already been covered with respect to members of the field judiciary in the Army. These are the Law Officers and members of the Army Boards of Review. One of these bills provides for the creation of a Navy JAG Corps. They have lawyer line officers assigned as Legal Officers now.

To avoid some of the more unacceptable provisions of these bills, the various services have agreed on two bills known as the "C" and "H" bills, which have been submitted to Congress and were introduced in the House by Representative Wickersham who also introduced the Ervin bills in the House of Representatives.

The "C" bill provides for single officer, general and special courts and law officers on special courts if desired. This will permit the Army special courts to give bad conduct discharge. Mandatory counsel will be required on courts where such discharges may be given.

The "C" bill also provides for a life-time oath by law officers and military counsel. This will have the time of courts-martial. The bill also provides for one oath by the court. The members will only have to take a one-time oath while sitting on that particular court.

The "H" bill lengthens the time for new trials (from one year at present) to two years.

There are other technical changes recommended by these bills and by the Department of Defense, so it is obvious that even at this time we are in for more changes in the administration of military justice, with the purpose in mind, of course, of giving the accused as fair a trial as is possible.

Now, I would like to explain to you the manner in which members of courts are selected at Fort Devens. A new general court-martial is appointed once every four months, and a new Post special court-martial is appointed every two months (ASA, Brigade, and the separate battalions use other periods of time for their special court members to serve). On the Post side, prior to the expiration of such two and four month periods, the Post Adjutant General is reminded by my office that a new court is needed by a certain date, to replace the court in existence. To obtain experienced personnel and to train junior officers, we prefer to use on each general court-martial three lieutenant colonels, three majors, and three captains; for a special court-martial, two majors, two captains, and three first lieutenants, plus four lieutenants who are used as counsel. Only officers assigned to Post Headquarters are called upon to sit as members of special courts-martial, as the other major units on post, as I have mentioned, convene their own special courts-martial. Thus, the only time

officers not assigned to Post Headquarters would be called upon as court members for the headquarters would be to sit as members of a general court. As we have approximately 750 officers on Post, and we use nine members once every four months, this should not impose too onerous a burden on anyone, though we must recognize that doctors, chaplains, the JAG, IG, PM and certain other members of the general staff are necessarily exempt.

Once the AG receives notice that a new court is needed, he contacts the various units and advises them that it is their turn to provide certain officers for the court. The names are provided by the unit, and the AG then submits the list directly to the Commanding General for approval. If the Commanding General approves the list, the order is published and the new court members are notified. In short, the Judge Advocate has nothing to do with the selection of court members. The United States Court of Military Appeals has held that the Commanding General *must personally* approve members of courts he convenes. By the same token, he must *personally* excuse members from court duty; again, neither the Chief of Staff, the Deputy Commander, nor the Judge Advocate, nor anyone other than the Commanding General may excuse you from court duty. So when one of my captains calls and advises you that court is meeting at a certain time and place, don't take it out on him; if you want to be excused, call me or Major Snyder in my absence, and we will contact the General with your request, or if you desire, you can call the General personally and ask to be excused. The trial counsel can't excuse you, nor can I.

Our experience over the last year indicates that if you are a member of a general court-martial, you will be called on an average of twice a month, each time you will normally sit for one or two days on two to four cases. There are exceptions, we have had one case take five days, but generally you will sit on the court an average of about four days a month for four months.

We have to schedule our cases when a law officer, who comes from New York, is available; therefore, we try and schedule three to four cases at one time, so an accused is not sitting in pretrial confinement two or three months awaiting trial.

The Uniform Code of Military Justice imposes certain time requirements on us. For example: Article 30 of the Uniform Code of Military Justice requires that the accused shall be informed of the charges against him as soon as possible. Article 33 requires that where a person is held for trial by general court-martial, the commanding officer shall within 8 days after accused is ordered into arrest or confinement, *if practicable,* forward the charges to the officer exercising general court-martial jurisdiction. Article 35 also states that no person may be brought to trial against his objection within a period of 5 days after the service of charges upon him.

At Fort Devens, which is the collection station for the New England Area, we have a particular problem. We have to send for documentary evidence usually in the form of morning reports from all over the world. Many times these reports when received after a long period of time, during which the accused may be confined, are inaccurate, contain strikeovers, have wrong names and serial numbers, etc., and we have to go back again to the unit. We are not taking advantage of the individual by keeping him in pre-trial confinement during this period as long as we take every action possible to obtain proper evidence. This is an area in which you as unit commanders can be of great assistance, make certain that the documents you forward are accurate, correct and contain no strikeovers. You will be blest by JA's like myself, rather than called names I shall not repeat here.

Now, let us also look to the jurisdiction of the various court-martial and the penalties imposable by them. I am sure you have been advised of these matters previously, but for your better understanding, let me remind you.

A Summary Court-Martial, where

Article 15 action cannot be taken, has jurisdiction over minor offenses. It is composed of one officer and the maximum punishment imposable by such a court-martial is 30 days confinement at hard labor, forfeiture of two-thirds pay for a month, and reduction to the lowest enlisted grade. If you are selected as a Summary Court Officer, I recommend heartily that you read thoroughly DA Pamphlet 27–7, dated September 1964. It is quite helpful.

Next comes the Special Court-Martial, composed of three or more officers. It is used to try more serious offenses and the maximum punishment imposable by such a court in the Army is confinement at hard labor for six months, forfeiture of two-thirds pay per month for six months. The Air Force and Navy special courts can, where a verbatim record of the trial is made, impose a Bad Conduct Discharge. But the Department of the Army does not presently authorize such action, as I have mentioned. I also recommend to those who sit on special courts that they read DA Pamphlet 27–15; it will be of value.

Last and of major importance because of the more serious cases it hears and the maximum sentences it may impose, is the General Court-Martial composed of five officers or more, which depending on the offense involved, and in some cases where the offense involved is committed during time of war, may impose in addition to a dishonorable discharge, death, life imprisonment, or any number of year confinement at hard labor, total forfeitures, and reduction to the lowest enlisted grade.

Going now to your actual responsibilities as General Court-Martial members, let's talk a few minutes about what actually happens once you are in court. After the usual preliminaries of swearing the court, challenges, and reading of the charges, an accused enters his plea; if he pleads guilty, the law officer on a general court is *required* to hold a hearing, out of the presence of the court, to determine the providency of the accused's plea of guilty. This normally takes 20 to

**121**

30 minutes, and it is at this point that court members usually start to get upset. They must stand around waiting for the hearing to end, with nothing to do, and believe that their time is being wasted. Unfortunately, there is nothing that can be done about this, for the Court of Military Appeals has ruled that the hearing must be held out of the hearing of the court members. We have a bill presently before Congress, and have had each year for the past few years, which would authorize us to hold pre-trial hearings to get all of these various motions and other matters disposed of before the court was called. If successful, you will no longer have to stand around while the lawyers are arguing in private. But until that bill passes, we are stuck with our present system, and you must accept this as a part of our court-martial procedure.

Going now to the real crux of the matter, I want to discuss your specific responsibilities as court members. First and foremost, you are jurors; you listen to the evidence presented by both sides, and then determine the guilt or innocence of the accused. Each member has an equal voice and vote with other members in deliberating upon and deciding on questions submitted to vote or ballot. This sounds like a simple task, but it involves a grave responsibility, for you are dealing with human lives. Many court members let their personal feelings control their decision, rather than using their judgment to arrive at a finding. What do I mean by this? Simply this; some people feel strongly about sex offenses; others about barracks larcenies, and some people think the whole proceeding is a waste of *their* valuable time; in short, they are substituting their feelings for the law. Rather than listen to the evidence and arrive at an objective decision based on the law and the evidence, they vote according to their own personal feelings in the matter. When this occurs, our system of justice fails; it indicates that such an officer has no sense of responsibility, and it gives our system of military justice a black eye. And I might add that the system works

both ways—that is, it results in unjustified convictions as well as unjustified acquittals. Gentlemen, it is not your job as court members to decide that the military justice system is wrong, or that a certain case shouldn't be before your court, or that it is ridiculous to try people for AWOL because they would just be fired in civilian life; the Code of Military Justice says this is a military offense and the Manual for Courts-Martial grades the punishment imposable by the length of the absence involved; it is your duty to *follow* the law, not disregard it, nor to make up rules at your whim and fancy. You take an oath as a member of the court that you will faithfully perform all duties incumbent on you as a member of the court, and that you will faithfully and impartially try, according to the evidence, your conscience, and I repeat, the evidence and your conscience, and the laws and regulations provided for trials by court-martial. This is an oath which should not be taken lightly. A court is no place for prejudice, bias, or personal feelings. It is a place for common sense and objectivity. Being a court member requires no special knowledge beyond the normal experience of every officer. It requires common sense, and attention to what is going on in the court. Imagine how you would feel if you were on trial, and noticed one of the court members sleeping, and another doodling, or looking out the window, or laughing while the proceeding was going on. You think that I am exaggerating, but I can assure you that I have seen all of these things occur, and not just on isolated occasions. Such performances by court members are unfair to the accused, to the United States, and are certainly no credit to the court member himself. Although a court has no power to punish its members, improper conduct by a member, such as refusal or failure to vote or properly to discharge any other duty under his oath or otherwise, is a military offense.

After court members have arrived at a finding, if it is a finding of guilty, they must then listen to evidence in extenuation and mitigation, and then

determine what is an appropriate sentence in *each particular case*. In other words, you shouldn't say, nor can any one direct you, that all thieves should get two years, and all rapists must get twenty, etc. You must determine what is appropriate under the circumstances of each and every case.

What, then, should you consider? First of all, you must consider the offense itself; is it a civil type offense, a misdemeanor, or a felony, and in part define the terms for though we all speak English, we have difficulty understanding each other, even in our own families. For example, one day last summer I arrived home to find a screw loose on the screen door. I called to my daughter, Lyn, to bring me a screwdriver. After waiting impatiently, I called again. She answered saying, "Daddy, I've got the ice and orange juice, but we're out of vodka". Let me now distinguish between these two—felony and misdemeanor. A felony is any offense, the maximum punishment for which under the law is confinement in excess of one year. Misdemeanors are those offenses which are punishable by lesser sentences to confinement. Examples of felonies are: arson, rape, robbery, burglary, larceny of items of value, etc. And then a court-martial also has jurisdiction over military type offenses, AWOL, desertion, misbehavior before the enemy, disobedience of orders, failure to obey, etc. The seriousness of these offenses is also in part determined by the punishments imposable by a court-martial. Are there aggravating circumstances, such as beating the hell out of a girl before raping her, or beating and kicking a man after he is already unconscious. Are there mitigating circumstances, such as poor education, financial hardship on family, pregnant girl friend, extreme youth, happening to be with the wrong crowd at the wrong time, or being a victim of circumstances. How many previous convictions does the man have; what type of soldier has he been in the past; what was his reason for going AWOL? All of these things must be considered, and many more like them. Also, you must consider the needs of society in general, the needs of the Army to maintain discipline, and the needs of the accused as an individual. Again, gentlemen, let me emphasize that this is no place for your personal feelings; you may not have believed that the man was guilty, but it is your responsibility, once he is found guilty, to vote on an appropriate sentence. You shouldn't consider what you think the convening authority would like; it is your responsibility, and your's alone, to determine an appropriate sentence, under all facts and circumstances, past, present and future. There is much to be considered.

I think it would be well at this time to explain to you the effect of different sentences on an accused, because without understanding the effect of a sentence, it would be difficult to determine just what would be appropriate. There have been many cases reported where a court imposes a punitive discharge, but no confinement or forfeiture. This means that the accused returns to a full duty status, with pay and allowances, pending completion of the appellate review in his case. This may be for several months or more. Thus, he will be serving on duty for three to six months, knowing he is going to be given a bad conduct or dishonorable discharge when his case is approved. This can create a serious morale problem, as well as a serious disciplinary problem, for most people in such a situation wouldn't give a damn what they did. Not only they themselves might get in trouble, but they could also lead other soldiers in their unit into trouble. Don't misunderstand me, and think that there aren't cases where such a sentence is appropriate, for there are; but I am emphasizing that you as court members should consider the effect of such a sentence on the individual involved, judging each case on its own merits. Another example is a case where a court imposes a punitive discharge and total forfeitures. As the man is not in confinement, he is in a full duty status, and we cannot have a soldier on active duty, performing full military duty, without paying him.

**123**

Thus, we have two alternatives; we can withhold execution of the forfeitures until the case is approved, meaning that the man draws full pay and allowances, or we can reduce the forfeitures and order them executed while awaiting completion of appellate review in the case. In either case, we are not doing what the court believed was appropriate; however, it is illegal to have a man in a full duty status without any pay, so we have no choice but to take either of these actions. Another sentence which is not uncommon is to sentence a man to long period of confinement and partial forfeitures, without imposing a punitive discharge. I have seen sentences of two and three years imposed without a punitive discharge. Let me explain the result of this punishment. It means that the man would serve his confinement, less good conduct time, and go back to duty. As a result, the Department of the Army does not approve such sentences; normally, the man will be out of confinement in six months or less, and back on a full duty status. Again, the desires of the court are not carried out. It is difficult to say what court members actually intend when such a sentence is imposed; perhaps, they believe the man will be boarded out of the service. If so, they are mistaken, for a recent change in AR 635–200 (par 8, Change 11), provided that no member will be considered for administrative discharge because of conduct which was considered by a general court-martial if a sentence to punitive discharge was authorized but not adjudged. In short, we can't board a man for the same conduct for which he has been tried by general court-martial.

Another sentence I would like to mention is a sentence which imposes confinement but no forfeitures, which means that the man will be sitting in jail, doing nothing, but will be drawing full pay and allowances. While there are a few cases of extreme hardship where such a sentence might be appropriate, it seems rather incongruous to say that a man is so bad he should go to jail for six months or more, but should draw his full pay and allowances.

Finally, I would like to mention a sentence that occurs occasionally in a special court-martial. That is the sentence to confinement at hard labor, reduction to some intermediate grade, such as Private First Class, and partial forfeitures. Article 38a, Uniform Code of Military Justice, provides that any sentence which includes confinement at hard labor or hard labor without confinement reduces the accused to the lowest enlisted pay grade. Thus, a sentence to confinement or hard labor without confinement, as well as reduction to an intermediate grade, is inconsistent. The result is that the confinement or the hard labor without confinement must be set aside, as an accused is given the benefit of the doubt as to the court's intention. The punishment known as hard labor without confinement in some situations is a sentence that is hard to administer. In one situation in my experience, the work being performed by the regular duty soldier at the installation was harder than the hard labor which the confinement officer was able to devise. So, in such cases, consider the effect of the sentence you impose. In the case I mentioned, the effect on the morale on the regular duty soldier was devastating.

I hope that I have given you a better understanding of your duties as court members, as well as an understanding of the meaning and effect of the sentences imposed. I cannot emphasize too much the importance of duty as members of courts-martial, not only as Army officers, but as American citizens.

Now, as I've told you, I do not want to be charged with command influence. I have a story which I'll tell and from it's moral I don't want to preclude any questions, but merely advise you that you may not get the answer you want. The Flanagan Story.

Are there any questions?